**Wamiq SATTAR, Plaintiff–Appellant,**

**v.**

**MOTOROLA, INC., et al., Defendants–Appellees.**

No. 96–3084.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1997.

Decided March 12, 1998.

William J. Juneau, Dale A. DeLoriea, Lavelle, Juneau & McCollom, Oak Park, IL, Christopher J. Agrella (argued), Franklin Park, IL, for Plaintiff–Appellant.

Hans U. Stucki, Ann M. Hamilton (argued), Motorola, Incorporated, Law Department SHS, Land Mobile Products, Schaumburg, IL, for Defendants–Appellees.

Before BAUER, CUDAHY, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

After enduring a lengthy campaign of religious harassment from his supervisor, Wamiq Sattar was first transferred to a different section, then placed on probationary status, and finally was terminated from his position as an engineer for Motorola. Believing that the supervisor's religious intolerance lay behind his termination, Sattar sued Motorola and his two immediate superiors, raising claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1), and under state law. The district court granted summary judgment to the defendants on Sattar's Title VII claims and dismissed the state law claims without prejudice, declining to retain them under its supplemental jurisdiction. Although, taking the facts as Sattar presents them, it is plain that the supervisor behaved in a manner entirely unbecoming a person in a society that requires tolerance for the religious views of all, we agree with the district court that the summary judgment record does not support Sattar's claim.

**I**

Sattar is a native of Bangladesh, which until 1971 was known as East Pakistan. Like most of his compatriots, Sattar began life as a Muslim. Some twenty years ago, he moved to the United States, where he attended college. After graduation, he married a Lutheran woman and began regularly attending Lutheran services. In January 1990, Motorola hired Sattar to work as a staff engineer in the Personal Communications Network Group (PCN) at Motorola's Arlington Heights, Illinois, facility. Shortly thereafter, Motorola hired Arif Pardesi, who became Sattar's immediate supervisor. Pardesi is from Pakistan (formerly known as West Pakistan). Like Sattar, he was raised in the Muslim faith, but Pardesi remained a devout—one might say zealous—Muslim.

Jerry Campbell, the other individual Sattar named as a defendant, was Pardesi's supervisor.

Almost immediately after he started to work with Sattar, Pardesi began hounding him about his abandonment of Islam. The summary judgment record is replete with examples of Pardesi's badgering. Two weeks into their relationship, Pardesi warned Sattar that he (Pardesi) would watch Sattar "like a hawk." Pardesi constantly advised Sattar to follow the teachings of the Koran and to join Pardesi and other Muslims who worked at Motorola for weekly prayer sessions in Pardesi's office. Pardesi sent literally hundreds of e-mail messages to Sattar between January 1992 and June 1993 with citations to the Koran and dire warnings of the divine punishments that awaited those who turned their back on Islam.

Pardesi also made no secret of his view that Sattar's fate at Motorola lay in Pardesi's hands. On one occasion, he told Sattar that "Allah is the solution to all problems" and that "nonbelievers will be condemned to hell." When, in the summer of 1990, Pardesi promoted several of Sattar's coworkers and passed over Sattar, he told Sattar that "we need Khaliphas to lead the mission" and that Sattar would never be a Khalipha. (According to Islamic teachings, a Khalipha is a divinely inspired leader.) Going further, Pardesi expressly told Sattar that if he returned to Islam it would improve his standing in the eyes of his superiors.

Sattar responded by asking Pardesi to approve his transfer to another department—a request Pardesi flatly refused. Next, in June 1990 Sattar made a formal complaint about Pardesi's harangues to a human resources manager at Motorola. He made a second complaint in December 1990 to Motorola's human resources director, Martin Rogers. At that time, Sattar informed Rogers that Pardesi had forced a manager to downgrade a performance review of Sattar's work. The original draft, which Sattar had seen, had placed him at a 2.2 (satisfactory) level, but Pardesi ordered the writer to rewrite it and place Sattar at a 1.5 (unsatisfactory) level. Sattar also told Rogers about his unsuccessful efforts to transfer to another department. Rogers promised to investigate but never did so.

Other signals Sattar was receiving from Motorola were more positive. In 1991, he was temporarily loaned to another group, in which his performance was good enough to prompt the supervisor to write a complimentary letter for the file. Pardesi, however, refused to include the letter when the supervisor sent it to him, commenting again to Sattar that he didn't see him "as a Khalipha." Sattar also received two certificates from the Motorola Award and Recognition Program for his "outstanding achievement," one in November 1991 and the other in October 1992. In two other performance reviews, he received "satisfactory" ratings.

Notwithstanding those signs of success, after his return in August 1991 to Pardesi's direct supervision, Pardesi told Sattar that he had been ranked lowest in his grade level at a managers' rating and ranking session. These were meetings at which all the higher managers in the organization assembled to discuss the strengths and weaknesses of each employee. These rankings were independent of the performance reviews. In early 1992, Pardesi assigned Sattar to a particularly difficult project, which at least three other engineers had attempted without success. Sattar, too, had trouble with it. In December of that year he finally succeeded in transferring away from Pardesi's control. He informed his new supervisor, David Yen, that he believed that Pardesi was "out to get him" for not being a devout Muslim. For the first few months in Yen's section, Sattar was finishing up the project for Pardesi. Pardesi removed Sattar from the project in February 1993, with the comment that his work was "technically deficient," and replaced him with another engineer. That person was also unable to finish the work, which was reassigned to yet another engineer.

In April or May 1993, at another group ranking and rating session, Pardesi expressed the opinion that Sattar lacked competence in the use of a particular computer language, that he had logged false overtime, and that he had taken credit for work written by another engineer. By this time, of course, Yen was Sattar's supervisor. The consensus at the meeting was that Sattar ranked at the bottom of all job grade E09

engineers in his group. In keeping with Motorola's policies, Yen decided that Sattar should be placed in a Performance Improvement Plan (PIP), in which his work would be monitored closely. At Motorola, if an employee placed in a PIP successfully completes the program he may continue working; if not, he is fired.

Yen wrote the first draft of Sattar's PIP, but with input from Pardesi, according to Sattar. Yen asserted that he would have put Sattar on a PIP even if Sattar had not been having problems on the Pardesi project. In June 1993, Yen left the picture and Lisa Vecchio became Sattar's PIP supervisor. Vecchio redrafted the part of the PIP that described the specific tasks Sattar had to accomplish in order to "pass" the program, but she otherwise continued on the course Yen had set. Sattar, in the meantime, informed Christine Ioriatti, the person who supervised both Yen and Vecchio, about Pardesi's actions and threats. Ioriatti referred him (once again) to the human resources department, where he told Rogers of Pardesi's harassing e-mails. Within weeks of those meetings, the e-mails stopped. Soon thereafter, Pardesi transferred to a position in the United Arab Emirates.

Sattar completed the PIP on October 18, 1993. He alleges that Vecchio told him on that day that "you passed the PIP," but that he would not be notified formally until October 21. On the latter date, he learned that he was being terminated immediately. The PIP finding was mixed: while he had successfully completed the technical portions of the program, he was found to be lacking in "leadership, consistency, initiative, and responsibility skills." At the time Vecchio and Ioriatti met with him to pass along the bad news, Sattar alleges, Ioriatti told him that "Mr. Pardesi's activities have caused this termination; you should have done something about Pardesi's harassment long ago," such as obtaining a transfer away from Pardesi.

## II

■ Sattar named as defendants not only Motorola, but also Pardesi and Campbell "individually and in their corporate capacity." The district court correctly dismissed the complaint against the individual defendants. It is by now well established in this court that "a supervisor does not, in his individual capacity, fall within Title VII's definition of employer." *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir.1995); see also *Bryson v. Chicago State University*, 96 F.3d 912, 917 (7th Cir.1996). Since Sattar (for obvious reasons) has not alleged that Pardesi and Campbell are the sole owners of Motorola, we need not consider whether either individual has any "corporate capacity" separate from Motorola itself. *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1280 n. 2 (7th Cir.1995); cf. *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 n. 2 (2d Cir.1995) (holding open the "issue of whether . . . an individual may be made a party defendant solely in the person's corporate capacity as an agent of the employer—not subject to individual liability but a party for the purpose of discovery"). For purposes of the Title VII claim, therefore, we consider only Motorola's responsibility.

■ Sattar's claim in this case is that Motorola discharged him because of his religion. He has not alleged, and we therefore do not consider, whether he might have been entitled to relief for the on-the-job harassment he endured under the so-called "hostile environment" theory of discrimination. See *Venters v. City of Delphi*, 123 F.3d 956, 974–75 (7th Cir.1997) (religious harassment); *Jansen v. Packaging Corp.*, 123 F.3d 490, 493–94 (7th Cir.1997) (sexual harassment), cert. granted sub nom. *Burlington Industries, Inc. v. Ellerth*, —— U.S. ——, 118 S.Ct. 876, 139 L.Ed.2d 865 (1998). Even if his pleadings might have been capacious enough to encompass both theories, the purpose of summary judgment is to refine the case sufficiently so that both parties know the precise injuries alleged and the evidence that would be used to prove them. Sattar alerted Motorola only to his unlawful discharge claim, and that is the basis on which his case must now stand or fall.

■ Generally, when either the district court or this court decides whether a Title VII plaintiff can defeat an employer's motion for summary judgment, we identify two methods of proof the plaintiff might use. The first is the "direct" method, under which the plaintiff may show (either through direct

or circumstantial evidence) that the employer's decision to take the adverse job action was motivated by an impermissible purpose (race, sex, religious animosity, etc.). See *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir.1997); *Troupe v. May Department Stores*, 20 F.3d 734, 736 (7th Cir.1994). The second is the well-known "indirect" method, under which the plaintiff introduces enough evidence in his or her prima facie case to give rise to a presumption of discrimination. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). If the plaintiff succeeds in meeting this production burden, the employer must then articulate a legitimate, non-discriminatory reason for the action. See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). If it does so, the burden shifts back to the employee to provide evidence that would, if believed by a trier of fact, show that the true reason for the employment action was discriminatory. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993); *Pilditch v. Board of Education*, 3 F.3d 1113, 1116 (7th Cir.1993). As the Supreme Court has repeatedly reminded us, the ultimate burden to prove discrimination rests at all times with the employee. See *Hicks*, 509 U.S. at 508, 113 S.Ct. at 2747–48.

■ The distinction between the direct method, at least when circumstantial evidence is the vehicle for proving it, and the indirect method is an elusive one. Furthermore, when this court has reviewed employment discrimination cases after a full trial, we have made it clear that the various steps of the *McDonnell Douglas* method are essentially a heuristic device, not a rule of law. See *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir.1997). After all the tools are used, the question is whether the employer would have taken the same action had it not been for the protected characteristic of the employee. *Leffel v. Valley Financial Servs.*, 113 F.3d 787, 794 (7th Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997); *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir.1996). This is not to say that the ritual of the *McDonnell Douglas* approach has lost all

utility. To the contrary, it provides a useful organizational structure under which the parties and the district court can assess the need for a full trial. But, as *McDonnell Douglas* has been expanded to more and more kinds of discrimination, under more and more statutes, it has at times taken on an undesirable rigidity. This loses sight of the Supreme Court's admonition as long ago as 1978 that the elements of proof in an employment discrimination case were not meant to be "rigid, mechanized, or ritualistic." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ In our view, even at the summary judgment stage, the plaintiff's initial burden is to come forward with evidence that gives rise to an inference that the as-yet unexplained employment action in question was taken for a forbidden reason. Very often, the best way to do this will be to use the *McDonnell Douglas* steps, with appropriate modifications depending on the type of case that is presented. In some instances, however, the *McDonnell Douglas* approach may be a poor fit for the case, or the plaintiff may wish to introduce other kinds of evidence that also may give rise to an inference of discrimination. In keeping with the Supreme Court's comments in *Furnco*, a plaintiff should be free to meet his or her initial burden with this kind of evidence as well, whether we describe it as "mosaic" evidence, see *Troupe*, 20 F.3d at 737, or something else.

In a case presenting a complaint about religious discrimination that was quite similar to ours, on which the district court relied, the Tenth Circuit decided to reject the classic *McDonnell Douglas* formula in favor of the following more flexible approach:

> ... [I]n order to establish a prima facie case in actions where the plaintiff claims that he was discriminated against because he did not share certain religious beliefs held by his supervisors, we hold that the plaintiff must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the

employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

*Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033, 1038 (10th Cir.1993) (footnote omitted). In our view, this identifies the key issues, and focuses the third element (which roughly corresponds to parts 1 and 4 of the traditional *McDonnell Douglas* test—membership in a protected class, and an unexplained failure to be placed in a job opening) more squarely on the conduct the statute prohibits. Indeed, were one to delete the words after "a discriminatory motive," what is left would be a fair description of an employee-plaintiff's initial burden in any Title VII case.

■ While Sattar paints an awful picture of Pardesi's behavior toward him, in which it is clear that Pardesi's animus was based on Sattar's failure to follow the religious path Pardesi thought he should have, we agree with the district court that Sattar failed adequately to link his discharge to Pardesi's religious harassment. We begin with Sattar's strongest piece of evidence, namely, his allegation that Ioriatti specifically told him at the termination meeting that "Mr. Pardesi's activities have caused this termination; you should have done something about Pardesi's harassment long ago." Nonetheless, Ioriatti's opinion does not change the undisputed fact that Pardesi had no direct role in the decisionmaking process that led to Sattar's termination. It was Yen who made the initial decision to place Sattar in the PIP, and Vecchio who structured the PIP for Sattar, who supervised his performance in it, and who made the decision to fire him. Although Sattar has his suspicions, which he details at length, he has not presented any evidence to show how their negative view of his performance was the result of anything Pardesi had said. In short, Ioriatti's statements do not amount to enough evidence on their own to support an inference that the responsible Motorola officials discharged Sattar because he did not share Pardesi's Muslim beliefs.

■ But, Sattar argues, one cannot trust any evidence from Vecchio, Yen, or the other company managers whose evaluations were so devastating to him, because Pardesi poisoned the well for all the others. The dis-

trict court was willing to assume, and so do we, that when viewed this way the evidence of record was enough to raise an inference that Sattar's discharge was based on impermissible reasons. See *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990); *Crader v. Concordia College,* 724 F.Supp. 558, 564 (N.D.Ill.1989); see also *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir.1997) ("[T]here can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate.").

At this point, we must take into account Motorola's proffered reasons for the discharge. Motorola argued that he was fired both because his performance was deficient and because he lacked leadership skills. On their face, these easily qualify as legitimate, non-discriminatory reasons; indeed, they are a staple of employer responses in these situations. See, *e.g., Skouby v. Prudential Ins. Co. of America,* 130 F.3d 794, 797–98 (7th Cir.1997) (deficient performance); *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011, 1015 (7th Cir.1996) (deficient leadership skills). It is therefore Sattar's burden to offer some evidence to show that they are pretextual.

■ He attempts to do so in two ways. First, he points out that he failed only on the subjective part of the PIP, for a lack of "consistency, leadership, initiative, and responsibility skills," not on the objective tasks he was given. Nevertheless, nothing in Title VII bans outright the use of subjective evaluation criteria. It is true that an employer's use of subjective criteria may leave it more vulnerable to a finding of discrimination, when a plaintiff can point to some objective evidence indicating that the subjective evaluation is a mask for discrimination. See, *e.g., Giacoletto v. Amax Zinc Co.,* 954 F.2d 424, 427–28 (7th Cir.1992); *EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 332 (7th Cir.1988). It is that extra piece of objective evidence that Sattar has not provided. There is nothing to indicate, for example, that others whose work style was similar to his received consistently better subjective evaluations, or

that his evaluations fell after a particular event tied to Pardesi's religious bias. Nothing indicates that Vecchio or Yen harbored any animus toward him, or that Pardesi was some kind of Svengali controlling their actions. Indeed, by moving Sattar away from Pardesi and giving him another chance under different supervisors, Motorola did what it could to eliminate whatever negative influence Pardesi may have had.

 Next, Sattar argues that Motorola's failure to investigate his repeated claims of harassment by Pardesi indicates that it was tacitly endorsing Pardesi's religious bigotry, and in turn suggests that the reasons proffered for his termination were pretextual. Again, even if at the summary judgment stage we accepted the first of these propositions, the evidence does not create any link between Motorola's indifference to his complaints and the reasons it gave for his termination. Vecchio's affidavit stated that she "received no input" from Pardesi in writing her PIP evaluations and that she discussed neither Sattar's work nor her evaluation of him with Pardesi. Yen said that he knew that Sattar "was not performing well in Pardesi's group," but that he felt he could give Sattar "a fresh start" in his own group. Accepting Sattar's allegations that Pardesi influenced the design of the PIP, there is still nothing to show that he infected Vecchio's conclusions at the end of the process. Sattar obviously believes that he might be able to show that Vecchio and Yen were lying about the independence of their evaluations, if he had the chance to put them on the stand. This, however, is not enough to forestall summary judgment. See *Price v. Rochford,* 947 F.2d 829, 832–33 (7th Cir.1991); *Corrugated Paper Products, Inc. v. Longview Fibre Co.,* 868 F.2d 908, 914 n. 6 (7th Cir.1989) (citing cases). If it were, summary judgment itself would be a dead letter, rather than the essential screening device it has become for litigation today. *Oates v. Discovery Zone,* 116 F.3d 1161, 1175 (7th Cir.1997); *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 475–76 (7th Cir.1997).

### III

 Last, Sattar has raised two procedural challenges to the district court's decision, in which he complains about the court's rulings on two of his discovery requests. We review this kind of evidentiary matter only for an abuse of discretion, recognizing that " '[d]istrict courts have broad discretion in matters related to discovery.' " *Jurcev v. Central Community Hospital,* 7 F.3d 618, 627 (7th Cir.1993), quoting *Dole v. Local 1942, IBEW, AFL–CIO,* 870 F.2d 368, 371 (7th Cir.1989). First, he claims that the court should not have denied his motion to compel Motorola to produce (at its own expense), some 210,000 pages of hard copy reflecting e-mails that were sent. Motorola had produced the e-mails, but in the form of 4-inch tapes, which were inaccessible to Sattar because he lacked the equipment and software with which to read them. The court decided that a more reasonable accommodation was some combination of downloading the data from the tapes to conventional computer disks or a computer hard-drive, or loaning Sattar a copy of the necessary software, or offering Sattar on-site access to its own system. If all of those options failed, the court ordered that the parties would each bear half the cost of the copying. This seems to us an entirely reasonable resolution of Sattar's problem, and far from an abuse of discretion.

 After that order, Motorola provided Sattar with a hard drive, onto which it transferred the requested e-mail data. When he reviewed it, Sattar and his attorneys claimed that they found evidence that at least some of the data had been altered or modified, and that some of it was incomplete. Sattar then moved again to compel discovery and also for an order to show cause why Motorola should not be held in contempt. The district court found that the motion to compel violated Local Rule 12(K), under which the district court will refuse to hear a motion for production unless it includes a statement (1) that after interactive consultation the parties attempted, but were unable, to resolve the dispute; and (2) that counsel's attempts to engage in consultation were unsuccessful due to no fault of counsel's. The court denied the motion for the order to show cause because of the lack of any evidence tending to controvert Motorola's attorneys' affidavits swearing that no e-mail message had been altered or deleted.

Although the district court took a fairly strict approach to Local Rule 12(K), under the circumstances here we do not find this was an abuse of discretion. In context, the court's order relies on Motorola's argument that Sattar was trying through this motion to broaden the scope of his discovery of the e-mails. The court acted within the range of reasonable litigation management when it refused to allow Sattar to do so without the necessary predicate dealings with opposing counsel. The court's ruling on the order to show cause rested on its assessment of the credibility of Motorola's lawyers. Sattar gives us no reason to second-guess the court's decision.

We therefore AFFIRM the judgment of the district court.