Martin I. ROBIN, Plaintiff,

v.

ESPO ENGINEERING CORPORATION,
Defendant.

No. 97 C 5577.

United States District Court,
N.D. Illinois.

Oct. 16, 1998.

896

Thomas Carl Crooks, Attorney at Law, Chicago, IL, for Martin I. Robin, plaintiff.

Patricia M. Higgins, Nagle & Higgins, Naperville, IL, for Espo Engineering Corp., defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Martin Robin filed this lawsuit against Espo Engineering claiming that but for his age, religion, and disability Espo would not have fired him, and therefore that Espo violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 *et seq.* The case is now before the Court on Espo's motion for summary judgment which, as explained below, we reluctantly grant.

### FACTS

In accordance with the summary judgment standards, we recite the evidence in the light most favorable to Robin, and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Espo is a family-run company with approximately 250 employees engaged in the business of leasing temporary technical personnel. Eugene Esposito Sr. ("Esposito") is the CEO and majority owner of Espo; Eugene Esposito Jr. ("Eugene") holds the minority interest. In 1985, Esposito hired Robin, who is Jewish, as an account executive. Robin was 50 years old when hired, and had at least 18 years' experience in the temporary placement business.

Initially, Robin's performance was more than satisfactory. In fact, he had the highest sales of any account executive at Espo in 1989 ($1,446,503.00), 1990 ($1,432,656.00) and 1992 ($1,389,197.00). But in 1992, Esposito refused to approve a bid lower than the regular 1.6 profit margin for one of Robin's clients, the Water Reclamation District, and Espo lost the contract.[1] As a result, Robin's 1993 sales fell precipitously to $763,727.00, putting him in last place among Espo's "experienced" account executives—defined as salespeople who had been with Espo for three years or more.[2] In his 1993 performance review, Esposito commented on Robin's disappointing sales figures and instructed him to increase in-person calls, visit new leads, and limit his "lunches to once a week" (R. 17, Espo's 12M Statement App. 1, Robin Dep.Ex. 5.)

In 1994 and 1995 Robin increased his sales to $1,039,468.00 and $1,076,920.00 respectively; however, these numbers were insufficient to lift him out of last place in sales among the experienced account executives. Figure 1, which follows on the next page, represents the sales information of Espo's experienced account executives from 1993 to 1995 for purposes of comparison.

| | 1993 | 1994 | 1995 |
|---|---|---|---|
| Hugh Dunbar | $1,364,144 | $1,978,056 | $2,724,950 |
| Tom Reicher | $1,025,807 | $1,411,621 | $2,071,699 |
| Kurt Mills [3] | | | $1,468,418 |
| Robin | $ 763,727 | $1,039,468 | $1,076,920 |

*Figure 1: Espo Senior Account Executives' Sales for 1993 to 1995*

In July 1995, Robin was diagnosed as having cancer. On July 28 he had surgery, and was off work for four weeks to recover. Robin began chemotherapy in September

---

1. *Espo disputes this fact. Esposito stated at his deposition and in his affidavit that he approved the bid based on the lower mark-up proposed by Robin, and that a different company simply under bid them.*

2. On the other end of the experience spectrum were "junior" account executives, those within the first three years of employment with Espo.

3. Kurt Mills was hired in 1993, and therefore did not become an "experienced" account executive until 1996. In 1993, Mills had sales of $584,096; in 1994, his sales were $883,429.

1995. Once a week Robin would leave work early to receive treatment; this pattern continued for one year. Robin initially had bad reactions to the medicines he was receiving and felt horrible until the medications were adjusted.

On December 29, 1995, Esposito met with Robin and said, "Marty, you're not the same man you were six months ago." Esposito suggested that Robin take a paid leave of absence until September 1, 1996, the anticipated completion of Robin's chemotherapy. Esposito drafted a proposed leave agreement which stated that Robin would receive full wages and benefits while on leave and that he would be "entitled to return to Espo Engineering as an account executive . . . provided you are 100% capable of performing your duties." (R. 21, Espo 12N Statement, Esposito Sr. Dep. Ex. 9.) However, Robin would receive full commission only on his "old accounts" and either 50% commission or no commission on new business from his client list. At the end of the proposed leave, Esposito would decide whether Robin was 100% capable.

Robin declined the leave offer, which he viewed as a thinly veiled attempt to terminate his employment. In a January 17, 1996 memorandum to Esposito, he declared, "I am presently fully qualified to continue my duties with Espo Engineering as a capable and productive 'Account Executive.' " (R. 17, Espo 12M Statement App. 2, Esposito Sr. Dep.Ex. 10.) The memo also reminded Esposito that Robin had generated sales of over $11 million during his eleven years with Espo.

On January 29, 1996, Robin received his 1995 Annual Review. This performance evaluation revealed that Robin placed last out of all Espo's account executives, both junior and experienced, in five of six categories: number of in-person calls (143), number of customers visited (118), percentage of 100 list covered (39%),[4] number of new customers (3), and number of sales closed (44). (R. 17, Espo 12M Statement App. 2, Esposito Dep. Ex. 8.) The only category in which Robin did not rank last was sales volume; there he ranked fifth out of seven with sales worth $1,076,920.00. As Esposito noted, "[t]he only sales persons [sic] you are out performing are two very Junior Account Executives with one year experience." (Id.) The evaluation included the following comments:

> This is a very poor performance from a Senior Account Executive. You barely met the minimum requirement in a great market.

> Account Executives at the Senior Account level increased their sales from 38% to 49% while your increase in sales was 3% in 1995, in addition Senior Account Executives out sold you by 200% to 350% in 1995. A Junior Account Executive [i.e. Kurt Mills] increased sales by 66% and out sold you by 50%.

(Id.) The evaluation concluded with a "Solutions" section:

1. Make more in person [sic] sales calls to generate new business.

2. Cut lunches back to one per week.

3. Eliminate tardiness and be ready to start work at 8 A.M.

4. Stop having long conversations with fellow staff members that have nothing to do with business.

4.[sic] In 1992 you sold 1.4 million, in 1996 we expect a minimum of 1.5 million.

(Id.) Although Esposito actually prepared the evaluation, Larry Lenza, Vice President of Sales, signed as the preparer and, according to the evaluation, Esposito simply "ap-

---

4. Each account executive had a list of 100 businesses for which he was responsible. Neither party explains the precise import of the lists or what the salespeople were expected to do with respect to the companies on their lists. But the 1995 performance reviews suggest that the companies on the lists were the exclusive domain of the salesperson, but that if the salesperson failed to "cover" their list, or call on each company on the list at least once during the year, the company could be transferred to another sales representative. (See, e.g., R. 21, Robin 12N Statement App. B, Robin Dep.Ex. K (1995 Annual Review, High Dunbar), Ex. L (1995 Annual Review, Tom Reicher), and Ex. M (1995 Annual Review, Kurt Mills).)

proved" the document. The record does not reveal whether this was the general practice, or whether Esposito prepared only Robin's Annual Review.

Robin's sales did not improve in 1996. During the first quarter his sales amounted to $206,624; in the second quarter they were $217,208; and in the third quarter they were $149,111. (R. 17, Espo 12M Statement App. 11, Esposito Sr. Aff.Ex. 2.) Figure 2, which follows on the next page, represents the sales figures for Espo's experienced account executives during the first three quarters of 1996 for purposes of comparison.

| | 1st quarter | 2nd quarter | 3rd quarter | total |
|---|---|---|---|---|
| Hugh Dunbar | $642,393 | $493,246 | $444,344 | $1,579,983 |
| Tom Reicher | $579,629 | $688,332 | $615,093 | $1,883,054 |
| Kurt Mills | $715,321 | $637,232 | $397,490 | $1,750,043 |
| Robin | $206,624 | $217,208 | $149,111 | $ 572,943 |

*Figure 2: Espo Senior Account Executives' Sales by Quarter for 1996*

On September 27, 1996, Esposito met with Robin to suggest a buy-out of his employment contract in exchange for a waiver of any legal claims against the company. When Robin refused the proposed buy-out, Esposito fired him. Esposito's stated reason for firing Robin was his poor sales performance and the virtual impossibility that Robin would meet the performance goal of $1.5 million in sales set out in his 1995 Annual Review.

On January 6, 1997, Robin filed a charge with the Equal Employment Opportunity Commission, alleging that Espo discriminated against him by firing him based on his age, religion, and disability in violation of the ADEA, Title VII, and the ADA. The EEOC issued a right-to-sue letter and Robin filed this lawsuit presenting the same claims.

Upon the completion of discovery, Espo filed a motion for summary judgment. It contends that Robin was fired because he was not meeting Espo's bona fide expectations as delineated in Robin's 1995 Annual Review. Espo maintains therefore that Robin cannot establish a prima facie case of unlawful discrimination. Alternatively, Espo argues that even if Robin presents evidence supporting an inference that he was meeting Espo's expectations, he cannot show that Espo's stated reason for firing him was a pretext for unlawful discrimination.

Robin opposes Espo's summary judgment motion. First, he argues that Espo's expectation that he make $1.5 million in sales was illegitimate because (1) no other account executive was given a performance goal higher than $1 million, (2) the 1995 Annual Review was fraudulently prepared, and (3) he was undergoing debilitating chemotherapy. He contends that, in any event, he was fired before the end of 1996 and thus was never afforded the opportunity to satisfy the $1.5 million performance goal. He also argues that Espo's discriminatory refusal to approve the lower-margin bid on the Water Reclamation District contract was the reason his sales were low: in other words, Robin suggests that a jury could reasonably find that Espo set him up to fail because of his age, religion, and disability. As to pretext, he claims that the 1993 and 1995 performance reviews are suspect because those were the only two years Espo performed formal reviews. He also argues that a jury could infer pretext from the proposed leave of absence because it was really a veiled attempt to fire him. Finally, he points to derogatory comments regarding his age and religion as evidence of Espo's discriminatory animus.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law. Fed. R.Civ.P. 56(c). To avoid summary judgment, the nonmovant must advance "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Although in the summary judgment context courts must construe the facts in the light most favorable to the nonmovant, "neither the mere existence of some alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1121 (7th Cir.1998) (citations omitted). However, because this is an employment discrimination case, we must "take care not to resolve any genuine disputes that have been properly established as to the employer's intent and credibility." *Leffel v. Valley Fin. Serv.,* 113 F.3d 787, 792 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997).

## ANALYSIS

In order to survive summary judgment, Robin must point to evidence arguably demonstrating that Espo intentionally discriminated against him on the basis of his age, religion, or disability. *Hoffman,* 144 F.3d at 1121; *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). He can satisfy this burden in one of two ways; by using the direct-proof method or the *McDonnell Douglas* indirect burden-shifting method. *Hoffman,* 144 F.3d at 1121; *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1397 (7th Cir.1997); *Piraino v. International Orientation Resources, Inc.,* 84 F.3d 270, 274 (7th Cir.1996). Robin contends that the record contains both direct and indirect evidence of Espo's intent to discriminate against him on the basis of his age, religion, and disability.

### A. Direct–Proof Method of Establishing Discriminatory Intent

 Under the direct-proof method, "the plaintiff may show (either through direct or circumstantial evidence) that the employer's decision to take the adverse job action was motivated by an impermissible purpose (race, sex, religious animosity, etc.)." *Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1168–69 (7th Cir.1998). In other words, Robin must identify direct or circumstantial evidence that but for his age, religion, or disability Espo would not have fired him. *Hoffman,* 144 F.3d at 1121. Direct proof of discriminatory intent in employment cases generally takes the form of a decision maker's admission that the employee was fired because of a forbidden factor. *See, e.g., Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 167, —— L.Ed.2d —— (1998); *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1178 (7th Cir.1997). But "[t]o rise to the level of direct evidence of discrimination ... isolated comments must be contemporaneous with the discharge or causally related to the discharge decision[-]making process." *Kennedy,* 140 F.3d at 723 (citation omitted); *see also Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1403 (7th Cir.1996).

In support of his age and religious discrimination claims, Robin directs the Court to the deposition testimony of Duston Focht, a former recruiter at Espo.[5] Focht testified that in 1994 he heard Esposito refer to Robin as an "old SOB". Additionally, on another day in 1994, he heard Esposito tell Larry Lenza that Robin was "getting too old" during a conversation about sales.[6] Focht also said that one day he was passing Lenza's office and heard Hugh Dunbar, an Espo senior account executive, say "Jewish bastard" in the presence of Esposito, who did nothing. Focht assumed Dunbar was referring to Robin, the only Jewish account executive employed by Espo. The record does not reveal when Dunbar made his disgusting remark.

 None of these statements constitute direct evidence that Espo fired Robin because of his age or religion. The statements "old SOB" and "Jewish bastard"—

---

5. Focht left Espo in February 1996.

6. The entire context of these two age-related statements was not developed by the record before this Court.

while obviously offensive—are "stray remarks" that Robin does not attempt to link to Espo's subsequent employment decision. *Compare with Hoffman*, 144 F.3d at 1122 ("[E]ven taking the statement to mean 'we need a young person in Chicago' we cannot say that the statement is linked to the decision to fire Hoffman."); *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir.1997) ("[S]tray workplace remarks ... cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question."). The comment regarding Robin's religion was not even made by a decision maker. Although Esposito's remark that Robin was "getting too old" appears more probative of discriminatory intent, the statement was made in 1994, at least two years before Robin was fired. It was thus *too remote in time* to directly prove Esposito's state of mind in September 1996 when he fired Robin.

■ Robin also relies on statements made by Esposito and Eugene to the effect that they could not fire Robin while he was sick because they would "get in trouble." But "[n]o inference of guilt can be drawn from awareness of one's legal obligations." *Partington v. Broyhill Furniture Indus. Inc.*, 999 F.2d 269, 271 (7th Cir.1993). This evidence, like that discussed in *Partington*, shows only that Espo "was aware that a company that dismisses an older[, Jewish, or disabled] worker has potential liability under ... discrimination law." *Id.*

Our review of Robin's alleged direct proof of discriminatory intent, even when considered as one large circumstantial mosaic, leads us to conclude that Robin has failed to establish a direct discrimination case of age, religious, or disability discrimination.

## B. Burden–Shifting Method of Establishing Discriminatory Intent

The *McDonnell Douglas* burden-shifting methodology is sufficiently well known that we dispense with an in depth exposition and address only the arguments presented by the parties. For a full explanation of *McDonnell Douglas*, see *Hoffman*, 144 F.3d at 1123 (age discrimination), *Sattar*, 138 F.3d at 1169 (religious discrimination), *Leffel*, 113 F.3d at 792–93 (disability discrimination). Espo challenges Robin's ability to establish that he was meeting its legitimate performance expectations—an element of his prima facie case, *see Coco*, 128 F.3d at 1178—or that Espo's stated reason for firing him was phony, a pretext for intentional discrimination.[7] Robin counters that Espo's performance expectations were not bona fide and that he has produced evidence from which a jury could conclude that Espo's stated reason for firing him was a pretext for invidious discrimination.

### 1. Espo's Performance Expectations

■ Espo claims it fired Robin because by September 1996 it became clear that Robin would not satisfy his sales goal of $1.5 million as laid out in the 1995 Annual Review. Robin maintains that he has produced evidence establishing a genuine issue as to whether the $1.5 million goal was a legitimate expectation. A legitimate expectation is simply a bona fide expectation; an expectation actually held by the employer; a non-phony expectation. *Coco*, 128 F.3d at 1179–80. Whether an employer's expectations are reasonable or fair plays no part in this analysis: "[I]t is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers." *Id.* at 1179; *see also Vanasco v. National–Louis Univ.*, 137 F.3d 962, 967 (7th Cir.1998)

---

7. Espo concedes that Robin is a member of each of the protected groups alleged in the complaint (i.e. workers over 40 years old, Jews, and qualified individuals with a disability) and that Robin was fired. It also concedes that Robin has evidence demonstrating the various permutations of the fourth element of his prima facie case (e.g. that his replacement was younger and non-Jewish).

We admit surprise over Espo's concession regarding Robin's disability because it is far from clear that Robin could establish that he is a "qualified individual with a disability" as defined by the ADA. Nevertheless, we accept this concession for the purposes of this opinion because it does not materially affect the outcome of the defendant's motion for summary judgment.

("[E]mployment discrimination laws are not merit selection programs; nor do they mandate that employers follow reasoned and fair decisional processes."). After reviewing the evidence, we conclude that Robin has not produced evidence from which a jury could infer that Espo's $1.5 million sales goal was phony. Additionally, Robin has not established a genuine issue that he would have met the goal if not for Espo's discriminatory treatment.

In support of his position that Espo's expectation was illegitimate, Robin first argues that no other account executive was ever given a sales goal higher than one million dollars. Robin relies on his 1995 Annual Review in which Esposito wrote that Robin "barely met the minimum requirement" with sales of $1,076,920.[8] This evidence, of course, establishes only that the minimum sales requirement was one million dollars; it says nothing about whether Espo legitimately expected Robin, an eleven-year sales veteran, to do more than meet the bare minimum.

Furthermore, Robin is factually wrong that he was the only account executive to be assigned a performance goal above one million dollars. The 1995 Annual Reviews of other senior account executives reveal sales expectation far higher than that set for Robin. For instance, Esposito suggested that Hugh Dunbar should be able to increase his sales to $3,200,000 in 1996, Tom Reicher should top two million, and Kurt Mills should also pass the two million mark. As to Steve Clodfelter, a first-year account executive in 1995, Esposito wrote, "you have exceeded the first year goal of $500,000 by 50%. Great! Next year we expect the minimum of a mil-

lion but we think if the market holds up you should do a million and a quarter." The real difference between Robin's annual review and the reviews of other account executives is the tone used by Esposito to communicate the goals: the tone of Robin's review was harsh and punitive, whereas the tone he used with account executives who had performed well during 1995 was laudatory and upbeat. The difference is easily explained in nondiscriminatory terms: employees who are performing well do not need to be told "shape up or ship out."

Robin also claims that the 1995 Annual Review itself was fraudulently produced for the purpose of creating a paper trail to justify his discharge and, therefore, that the sales goal in the review must be phony. The only evidence he points to that the review was fraudulent, however, is that Lenza signed as the preparer when Esposito actually prepared the review. We see no connection between the purported signing irregularities and the substance of the review; who prepared the review and who signed which line is irrelevant to whether Espo truly expected Robin to produce $1.5 million in sales in 1996.

Robin's final argument on the legitimacy of Espo's expectation is that it would be unreasonable to expect $1.5 million in sales from someone undergoing debilitating chemotherapy. Robin's assertion that the $1.5 million expectation was unreasonable because he was undergoing chemotherapy is most pertinent to his claim of disability discrimination. See *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1052 (7th Cir.1997) ("[T]reatment for a cancer not itself shown to be disabling could be disabling within the meaning of the Act."). This court has no doubt

8. We do not consider the other evidence cited by Robin. Nancy O'Neill did not have personal knowledge of Espo's performance expectations in 1996 because she left the company in 1989. Terrence Newsome's deposition testimony does not indicate the time-frame during which he believed the sales quota was one million dollars. This is relevant because, apparently, Newsome worked at Espo during two distinct time periods: first from 1989 until May 1993 (when he was incarcerated for drug trafficking), and then again starting in 1995. Even assuming Newsome was discussing the sales quota during his second stint at Espo, he has no personal knowledge on the issue. Newsome was not an account executive, nor was he involved in sales at Espo. Moreover, Newsome left Espo Engineering in July 1995. Finally, Robin cites Tom Reicher's 1993 Annual Review, in which Esposito wrote "I'm glad to see you back in the million dollar sales bracket." Robin does not even attempt to explain how Reicher's 1993 review, which does not refer to quotas or performance goals, is in any way relevant to Espo's expectations in 1996. Thus, this evidence is not probative of Espo's performance expectations in 1996.

that chemotherapy can be an enervating experience, and that a humane employer would take such an experience into account when formulating performance expectations.

Yet, in response to Espo's proposed leave of absence, Robin represented to the company that he was "fully qualified to continue [his] duties ... as a capable and productive account executive." Thus, Robin explicitly disavowed any need to accommodate his cancer treatments. *See Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1134 (7th Cir.1996) (an employer is required to reasonably accommodate only known disabilities); *id.* at 1135–36 (when an employer is not responsible for a failure to identify reasonable accommodations, the employer is not liable for failing to accommodate the employee's disability). Robin cannot now complain that Espo did not take his chemotherapy into account when formulating its performance expectations.

Robin next argues that Espo sabotaged his ability to satisfy the 1996 performance expectation by refusing in 1992 to approve his below-margin bid on the Water Reclamation District contract.[9] He claims that Espo routinely approved below-margin bids proposed by younger, non-Jewish account executives.[10] We believe the 1992 events are simply too remote to support an inference of intentional discrimination in 1996. After all, in 1993 Robin's sales were dismal; had Espo wanted to get rid of him because he was older and Jewish, that would have presented the perfect opportunity. Robin does not claim that he was similarly discriminated against in subsequent years, even though Espo surely must have had the opportunity to further sabotage his sales had it wanted to.

Finally, Robin claims that Espo could not actually have expected him to produce $1.5 million in sales in 1996 because it fired him before he had the opportunity to accomplish this goal. Robin does not, however, point to any evidence even hinting that he could have made $927,057.00 in sales during the last three months of 1996 when he did not even achieve $600,000.00 in sales during the first *nine* months and, in fact, produced only $149,111.00 in sales during the three months immediately preceding his discharge. *See Leffel,* 113 F.3d at 794 ("[S]urely an employer does not have to wait until its bottom line is affected to discipline an employee whose work is found wanting."). Although a metaphysical doubt exists as to whether Robin could have accomplished Espo's performance goal, that level of doubt is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

For these reasons, we conclude that Robin has not shown the existence of a genuine issue that he was performing up to Espo's legitimate expectations and, therefore, he has not set out a prima facie case of age, religious, or disability discrimination. In essence, the chronology of relevant events does not support a basis for a reasonable jury to find that Robin was a victim of intentional discrimination on the basis of his age, religion, or disability. Robin claims he was a victim of intentional religious discrimination as early as 1992, yet he was not terminated until 1996, and he points to no evidence of religious discrimination occurring between 1992 and 1996. Robin bases his age discrimi-

---

9. Espo does not assert a timeliness defense to Robin's claims of age and religious discrimination with respect to this allegation, even though Robin clearly did not file an EEOC charge on this issue within 300 days of the alleged discriminatory treatment. *See Huels v. Exxon Coal USA, Inc.,* 121 F.3d 1047, 1049–51 (7th Cir.1997) (explaining that a claim accrues at the time of the discriminatory treatment, not later when the "most painful consequences" of the discriminatory acts are felt.). Because Espo has not raised the limitations period, it is waived. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) ("[F]iling a

timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that ... is subject to waiver.").

10. Robin's allegations regarding the Water Reclamation District bid severely undercut his disability discrimination claim. Robin was not disabled in 1992 and thus his subsequent illness and treatment could not have influenced Esposito's decision on the proposed bid. But if in 1992 Esposito was plotting to fire Robin based on his age or religion, as discussed in the text, he would not have waited until 1996 to do so.

nation claim primarily on some 1994 stray remarks, which also cannot establish intentional age discrimination in 1996. Finally, Robin was diagnosed with cancer in July of 1995. The treatment for this serious illness does not establish that his discharge over one year later was discrimination based on his medical condition. Instead, the undisputed evidence irrefutably establishes that the only material event that occurred within the relevant causal time period proceeding the dismissal was his continuous and consistent sales production decline. The onset of Robin's decline predated the stray remarks as well as his illness. Robin's firing under these circumstances may have been unfair but it was not discriminatory.

It is unnecessary under the circumstances to address the pretext prong of *McDonnell Douglas*. *See Coco*, 128 F.3d at 1180 ("[E]vidence [of pretext] would be relevant if Coco could show that he was performing up to his employer's legitimate expectations; but as he cannot, the question of the reason for his discharge does not arise."). However, for the sake of completeness, we turn now to Robin's arguments concerning pretext.

### 2. Proof of Pretext

■■■■■■ Even if Robin were able to demonstrate a genuine issue regarding Espo's expectations, to survive summary judgment he must also point to evidence showing that Espo's stated reason for firing him was a pretext for invidious discrimination.[11] "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir.1994). "[I]t is important to remember that, when we consider whether an employer's justification for dismissing its employee is pretextual, the inquiry is not whether the reason for the firing was a correct business judgment but whether

the decisionmakers honestly acted on that reason." *Bahl*, 115 F.3d at 1291.

Robin first argues that the suspicious nature of the "paper trail" leading to his discharge shows that Espo's stated reason is not worthy of credence. The paper trial he is referring to consists of the 1993 and 1995 Annual Reviews. (We discuss the proposed leave of absence below.) He claims these documents are suspicious because the only time he received a formal performance evaluation was in 1993, the year effected by the alleged discriminatory treatment over the Water Reclamation District bid, and in 1995, the year he was diagnosed with and started treatment for his cancer.

Even assuming that Robin is correct that the 1993 and 1995 Annual Reviews were prepared for the purpose of firing him, this evidence would not support an inference of pretext. Robin does not dispute the truthfulness of the contents of the two reviews; he admits his sales were low. That Espo documented the low sales for the purpose of firing Robin does not suggest that Espo eventually fired him for a reason other than low sales.

Robin also directs us to Esposito's December 1995 statement: "Marty, you're not the same man you were six months ago." At the time, "six months ago" referred to June 1995, the month before Robin underwent cancer surgery. Robin argues that the "same man" statement, especially when considered in light of the leave of absence proposed during the December 1995 meeting (which was really a subtle attempt to fire him), shows that Esposito fired him because of his disability.

First, Robin's allegations regarding the proposed leave of absence are pure speculation. There is no evidence that Esposito was using the proposal as a way to ease Robin out of Espo, and the terms of the proposal do not support such an inference. Esposito's

---

11. As this sentence demonstrates, addressing the parties' pretext arguments after deciding that Robin did not meet Espo's legitimate expectations is ungainly: how can Espo's stated reason (i.e. that Robin's performance was unacceptably low) be pretextual if we already decided that Espo's expectations were legitimate and that Robin was not meeting the expectations. As explained in *Coco*, discrimination cannot be inferred under *McDonnell Douglas* when the employee's performance is subpar. 128 F.3d at 1179. However, we believe Robin deserves resolution of his arguments, and so we continue.

retention of the power to decide if Robin was 100% (and therefore entitled to return to work) is entirely unremarkable, as were the terms regarding payment of commissions. Moreover, Robin admits that he often felt lousy because of the chemotherapy and that it affected his work. Stating a truism (that the cancer and its treatment changed Robin) does not support an inference of intentional discrimination.

 Finally, Robin directs the Court to the same statements that we considered and rejected as direct proof of Espo's discriminatory intent. Robin correctly argues that sometimes remarks not directly related to an employment decision can be probative of discriminatory intent even when insufficient to directly prove discrimination.[12] But, standing alone, such statements rarely support an inference of intentional discrimination. *See Hoffman*, 144 F.3d at 1124 ("Standing alone, however, [age-related] statements [not directly related to the employment decision] are insufficient to establish pretext."); *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) ("[E]ven in an indirect proof case, remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent."). Again, Esposito's 1994 remark that Robin was "getting too old" is the only statement remotely probative of discriminatory intent. That statement, however, was too removed from Espo's 1996 decision to fire Robin. Additionally, that single statement is insufficient to rebut Espo's stated reason for firing Robin: it would not support an inference that Espo "would not have taken adverse action against [Robin] had [he] not been [older, Jewish, and] disabled and everything else had remained the same." *Leffel*, 113 F.3d at 794. Essentially, for the same reasons we rejected Robin's direct-proof argument, we reject his assertion that these statements demonstrate pretext.

 After careful evaluation of all of the evidence allegedly supporting Robin's direct and indirect claims of intentional age, religious, and disability discrimination, we feel compelled to comment that a plaintiff is ill-advised to rely on alternate and potentially inconsistent theories of recovery at this stage in the proceedings. Although alternate pleadings are liberally allowed under Rule 8(e)(2) of the Federal Rules of Civil Procedure, once discovery is complete it is incumbent upon counsel to decide whether the discovered evidence supports the alternate allegations in the complaint. Only exceedingly rare cases will truly lend themselves to valid claims of intentional discrimination on the basis of alternate characteristics of the plaintiff. Most plaintiffs are ill-served by the scattershot approach presented by this case. *See Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1006 (7th Cir.1997) (decrying "kitchen sink" approach to discrimination litigation); *Max M. v. New Trier High Sch. Dist.*, 859 F.2d 1297, 1300 (7th Cir.1988) ("This scattershot approach [on appeal] is the antithesis of sound advocacy").

## CONCLUSION

It is unfortunate that Espo could not exhibit greater patience and support for one of its long-term employees. Nevertheless, the issue before us is not fairness. Instead, the Court must determine if a reasonable jury could render a verdict in favor of Robin's various claims of intentional discrimination.

Robin has not pointed to evidence establishing a genuine issue that he was meeting Espo's legitimate performance expectations at the time he was fired and, therefore, has not made out a prima facie case of employment discrimination. Furthermore, he has not established a triable issue that Espo's stated reason for firing him was a pretext for invidious discrimination. For these reasons,

---

12. In its opening brief Espo addresses a computer incident it thought Robin would rely upon to establish his Title VII claim. Robin does not mention the incident in his response, and so neither do we.

we grant summary judgment in favor of Espo.