**Martin I. ROBIN, Plaintiff–Appellant,**

v.

**ESPO ENGINEERING CORPORATION, Defendant–Appellee.**

No. 98–3909.

United States Court of Appeals, Seventh Circuit.

Argued May 11, 1999.

Decided Jan. 13, 2000.

Thomas C. Crooks (argued), Chicago, IL, for Martin I. Robin, plaintiff—appellant.

Patricia M. Higgins (argued), Nagle & Higgins, Naperville, IL, for ESPO Engineering Corporation, defendant—appellee.

Before COFFEY, RIPPLE and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff Martin I. Robin ("Robin") filed charges of age, religion and disability discrimination against his former employer, Espo Engineering Corporation ("Espo"),

under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Americans with Disabilities Act ("ADA"), 42 U .S.C. § 12101 *et seq.,* respectively. After receiving a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"), Plaintiff filed suit in federal court on August 7, 1997. After discovery, the defendant filed a motion for summary judgment and the district court granted the motion on October 16, 1998. The plaintiff appealed. We AFFIRM.

## I. BACKGROUND

Espo is owned and run by Eugene Esposito, Sr. ("Esposito Sr."), CEO and majority owner, and his son, Eugene Esposito, Jr. ("Esposito Jr."). Engaged in the business of leasing temporary technical personnel, Espo has approximately 250 employees. In 1985, Esposito Sr. hired Robin, who is Jewish and was 50 years of age at the time, as an account executive. Espo account executives are basically salespeople and are required to solicit from an assigned client list of 100 businesses. While Robin was employed at Espo, account executives who had been employed for more than two years were considered "senior" and had an annual sales quota of one million dollars; account executives employed less than two years were considered "junior." From 1987 until his discharge, Robin was classified as a senior account executive.

Defendant acknowledges that Robin's sales performance from 1985 to 1992 was more than satisfactory. In fact, Robin ranked first in sales production for 1989, 1990 and 1992 with $1,446,503.00, $1,432,656.00 and $1,389,197.00 in sales, respectively. In 1993, Robin's sales dropped below one million dollars to $763,727.00 due to the loss of one of his major clients to competitive bidding, dropping him to last place among senior account executives. As a result, Robin received a negative performance review from Esposito Sr., which criticized his disappointing sales figures. The following year, Robin increased

his sales to $1,039,468.00 and did not receive a performance review even though his sales figures remained last among senior account executives.

In July 1995, Robin informed Esposito Sr. that he had been diagnosed with colon cancer and would be off work for a period of time recuperating from surgery. On July 28, 1995, Robin underwent surgery followed by chemotherapy treatment, necessitating his absence from work (with salary and commissions) for approximately four weeks until September 1995. Beginning that month and continuing for one year, Robin left work early once a week for chemotherapy treatment. Despite his absence and treatment, by the end of 1995, Robin had achieved $1,076,920.00 in sales, an amount slightly greater than the previous year but considerably less than his performance in 1989, 1990 and 1992.

On December 29, 1995, Esposito Sr. met with Robin and said, "Marty, you're not the same man you were six months ago," and offered Robin a paid leave of absence until September 1996, the anticipated completion of his chemotherapy. Under Esposito Sr.'s leave offer, Robin would have received full wages and benefits while on leave; however, his return to Espo as an account executive would depend on whether Esposito Sr. considered him 100% capable of performing his duties. Under the terms of the proposed leave, upon his return, Robin would be entitled to receive full commission on only 16 specified "old" accounts, while commission from his remaining 84 accounts would be "negotiated." Further, he would not be entitled to a commission on any account that produced new business during his absence. Robin asserts that he viewed Esposito Sr.'s leave offer as a veiled attempt to terminate his employment and turned it down. In a memo dated January 17, 1996, Robin wrote, "I am presently fully qualified to continue my duties with Espo Engineering as a capable and productive 'Account Executive.' " Later that month, Robin received his "1995 Annual Review,"

revealing that Robin placed last among all account executives, junior and senior, in the number of in-person calls made, number of customers visited, percentage of client list solicited, number of new customers and number of sales closed. The 1995 review, signed by Harry Lenza ("Lenza"), vice-president of sales, as the preparer of Robin's review and Esposito Sr., as approving the review, also indicated that even though Robin placed fifth out of seven in sales volume, the only salespersons he out-performed were two junior account executives with only one year of experience. The review further cautioned Robin that if he lost any one large account, his sales would be inadequate and thus concluded, "This is a very poor performance from a Senior Account Executive. You barely met the minimum requirement in a great market."

Robin's 1995 review also proposed a number of solutions: make more personal sales calls; cut lunches back to one per week, eliminate tardiness and be ready to start at 8 A.M.; stop long non-business related conversations with co-workers; and because "[i]n 1992 you sold 1.4 million, in 1996 we expect a minimum of 1.5 million." Although phrased more positively, the 1995 annual reviews for other senior account executives also contained sales expectations: Espo expected that Hugh Dunbar increase his sales to $3.2 million, Tom Reicher and Kurt Mills top two million and Steve Clodfelter, a first-year account executive, "do a million and a quarter."

During the first three quarters of 1996, Robin's sales were last among senior account executives and on pace to fall well below his $1.5 million sales goal. By the end of the third quarter, Robin had $572,-943.00 in sales while the other three senior account executives each had sold in excess of $1.5 million. On September 27, 1996, Esposito Sr. met with Robin to offer a buy-out of his employment contract in exchange for a waiver of any legal claims against Espo. Robin refused and Esposito fired him, justifying the discharge on Robin's poor sales performance and the virtual impossibility that he would be able to meet the $1.5 million sales goal set out in his 1995 annual review.

The plaintiff claims that Esposito Sr. and Esposito Jr. made various discriminatory remarks toward him during his employment. Sometime during 1994, Robin contends that Esposito Sr. referred to him as "getting too old" and an "old S.O.B." Robin also alleges that when he was undergoing chemotherapy treatments in 1995, Esposito Jr. stated to another employee, "We cannot just let him [Robin] go or we will get in trouble." Further, Robin claims that in 1996, Esposito Sr. told an employee that Espo could not get rid of Robin because he was sick.

On January 6, 1997, Robin filed a charge against Espo with the EEOC claiming that he was discriminated against on account of his age, religion and disability when he was discharged. Upon the issuance of a right to sue letter, Robin filed his action in federal court. Following discovery, Espo filed a motion for summary judgment contending that Robin had not set out a prima facie case of unlawful discrimination because he was not meeting Espo's legitimate performance expectations. The district court granted Espo's motion for summary judgment on October 16, 1998. Plaintiff appealed.

## II. ISSUES

On appeal, Plaintiff–Appellant argues that the district court erred in granting summary judgment to Defendant because his performance met Espo's legitimate expectations and the evidence is sufficient to establish pretext or, alternatively, a convincing mosaic of circumstantial evidence of discrimination.

## III. DISCUSSION

We review a district court's decision to grant summary judgment de novo. *See Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121 (7th Cir.1998). A motion for summary judgment should be granted when

there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, "a trial court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990) (citation omitted). To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir.1995) (citations omitted). However, neither presenting a scintilla of evidence, *see Senner v. Northcentral Tech. College,* 113 F.3d 750, 757 (7th Cir.1997), nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient to oppose a motion for summary judgment. *See Hoffman,* 144 F.3d at 1121. The party must supply evidence sufficient to allow a jury to render a verdict in his favor. *See Nowak v. St. Rita High School,* 142 F.3d 999, 1002 (7th Cir. 1998).

 Plaintiff claims that he can sustain his intentional discrimination case under both the direct and indirect methods of proof. However, Plaintiff's religious discrimination claim that he pursued before the district court was not raised in his briefs submitted on appeal, and is thus abandoned.[1] *See Libertyville Datsun Sales, Inc. v. Nissan Motor Corp. in U.S.A.,* 776 F.2d 735, 736–37 (7th Cir. 1985). For Robin's remaining claims, that

Espo fired him on account of his age or disability, the two accepted ways of establishing intentional discrimination are: first, by direct evidence (taking the form of, "I fired you because of your age or disability") or second, indirect evidence. *See Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994); *see also Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1168–69 (7th Cir.1998). Because employers usually are careful not to offer smoking gun remarks indicating intentional discrimination, the Supreme Court established the burden shifting approach as a means of evaluating indirect evidence of discrimination at the summary judgment stage. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the burden shifting method, should the plaintiff present sufficient evidence that establishes, by a preponderance of the evidence, a prima facie case of discrimination, a presumption of intentional discrimination arises. *See Wilson v. AM Gen. Corp.,* 167 F.3d 1114, 1119–20 (7th Cir.1999); *Sattar,* 138 F.3d at 1169. If the plaintiff succeeds in meeting his initial burden, only then does the burden shift to the defendant to come forward with evidence of a legitimate and non-discriminatory reason for the employment decision. *See Sattar,* 138 F.3d at 1169. At this point, the inference of discrimination disappears and the plaintiff must then prove, by a preponderance of the evidence, that the reasons proffered by the defendant were pretextual for intentional discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Moreover, because the Supreme Court has long held that the elements of proof in an employment discrimination case need not be "rigid, mechanized, or ritualistic," *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957

---

1. Even if Robin had claimed religious discrimination on appeal, he failed to present sufficient evidence to establish a prima facie case. Before the district court, Robin alleged that a fellow senior account executive said, "Jewish bastard," in Esposito Sr.'s presence. This statement alone, without other evidence demonstrating that the statement was related to the decision to discharge Robin or that Esposito Sr. was tainted by such statement, is insufficient to allow a rational jury to reasonably conclude that Espo discriminated against Robin on the basis of his religion.

(1978), this Circuit has held that a combination of direct and circumstantial evidence, "none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff," may allow a plaintiff to surpass the summary judgment hurdle. *See Troupe,* 20 F.3d at 737. Nonetheless, we continue to recognize that the burden shifting framework provides "a useful organizational structure under which the parties and the . . . court can assess the need for a full trial." *Sattar,* 138 F.3d at 1169.

## A. Direct Method

■ Under the direct proof method, Robin must demonstrate that Espo's decision to discharge him was motivated by an impermissible purpose: Robin's age or disability. *See Hoffman,* 144 F.3d at 1121 (7th Cir.1998). Thus, to survive a motion for summary judgment, Robin is required to present sufficient evidence to allow a rational jury to reasonably conclude that but for his age or disability, Espo would not have fired him. *See Hoffman,* 144 F.3d at 1121; *Nowak,* 142 F.3d at 1002; *Troupe,* 20 F.3d at 737. In support, Plaintiff offers various remarks made by Esposito Sr. and Esposito Jr. regarding his age and illness. First, Robin points out that in 1994, Esposito Sr. referred to him as an "old S.O.B." and described him as "getting too old." Second, Robin directs the Court's attention to when Esposito Jr. in 1995 and Esposito Sr. in 1996, told other employees that if they fired Robin, they would get in trouble because he was sick.

■ When proceeding under the direct proof method, in order for allegedly discriminatory remarks to "qualify as direct evidence of discrimination, the plaintiff must show that the remarks were related to the employment decision in question." *Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1403 (7th Cir. 1996) (quotation omitted). Esposito Sr.'s references to Plaintiff as an "old S.O.B." and "getting too old," lack temporal proximity to the employment decision because they occurred in 1994, two years prior to Robin's discharge on September 27, 1996. Further, without any evidence presented by Robin to the contrary,[2] these statements, the "old S.O.B." comment in particular, appear to have been made in the context of random office banter. Indeed, "conversational jabs in a social setting" do not constitute evidence of intent to fire for an impermissible reason. *See Hoffman,* 144 F.3d at 1122. Thus, without more evidence, we will not read invidious intent into isolated comments that, standing alone, are hardly offensive and remote in time to the discharge. Accordingly, because Esposito Sr.'s isolated, age-related comments were not "contemporaneous with the discharge or causally related to the discharge decision making process," *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir.), *cert. denied,* — U.S. ——, 119 S.Ct. 167, 142 L.Ed.2d 136 (1998), they are insufficient to create a triable issue of material fact regarding age discrimination. *See Fortier v. Ameritech Mobile Comm., Inc.,* 161 F.3d 1106, 1113 (7th Cir.1998).

■ Likewise, Esposito Sr.'s and Esposito Jr.'s comments that if they fired Robin while he was sick, they would get into trouble, is insufficient to create a triable material issue of fact because mere awareness of one's legal obligations can offer no inference of intentional discrimination. *See Partington v. Broyhill Furniture Indus. Inc.,* 999 F.2d 269, 271 (7th Cir.1993). Thus, we fail to understand how the evidence presented would allow a rational trier of fact to reasonably conclude that but for Robin's age or disability, he would not have been terminated by Espo. We now turn to his indirect proof evidence.

## B. Indirect Circumstantial Evidence

■ To survive summary judgment, we require sufficient "evidence from which

2. Duston Focht, a former recruiter at Espo, testified at deposition that he heard Esposito tell Lenza that Robin was "getting too old" during a conversation about sales.

a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because [he] was a member of a protected class." *Troupe,* 20 F.3d at 737; *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 658 (7th Cir.1991) (en banc). Although the *McDonnell Douglas* framework should not be construed as "rigid, mechanized, or ritualistic," *Furnco Const. Corp.,* 438 U.S. at 577, 98 S.Ct. 2943, it provides an organizational structure for us to assess the need for a full trial. *See Sattar,* 138 F.3d at 1169. Whether the evidence presented is characterized as "indirect" evidence or "mosaic" evidence, very often the best way to evaluate the plaintiff's case at the summary judgment stage is "to use the *McDonnell Douglas* steps, with appropriate modifications depending on the type of case that is presented." *See Sattar,* 138 F.3d at 1169. As previously discussed, under the burden shifting framework, the plaintiff must initially establish a prima facie case of unlawful discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case of age or disability discrimination, Plaintiff is required to present evidence adequate to create an inference that the adverse employment decision was based on an illegal discriminatory criterion. *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Accordingly, we require that Robin present the following: (1) he was within the protected class (over forty or disabled within the meaning of the ADA); (2) he was performing his job to the employer's legitimate expectations; (3) he was discharged; and (4) Espo hired someone else who was substantially younger or other such evidence that indicates that it is more likely than not that his age or disability was the reason for the discharge. *See Cianci v. Pettibone Corp.,* 152

F.3d 723, 728 (7th Cir.1998) (age); *Hoffman,* 144 F.3d at 1123(age); *Leffel v. Valley Fin. Services,* 113 F.3d 787, 792 (7th Cir.1997) (disability). Because neither party contests that Robin is within the protected class for his age discrimination claim, suffered from a qualified disability under the ADA,[3] or was replaced by a significantly younger non-disabled employee, we now resolve whether Robin was meeting Espo's legitimate expectations at the time of his discharge.

At the outset, this Court's inquiry into the issue of legitimate expectations is more aptly characterized as "simply *bona fide* expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers." *See Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir.1997) (emphasis added). In other words, so long as the employer's employment expectations are "in good faith[,] without fraud or deceit," *Blacks Law Dictionary* 168 (7th ed.1999), we only determine if the employee met them. Should Robin fail to establish that he was meeting Espo's *bona fide* expectations, he is not entitled to present his case to the jury and we need not proceed to the remaining steps of the *McDonnell Douglas* framework. *See Coco,* 128 F.3d at 1179–80.

Plaintiff initially contends that he met Espo's expectation for senior account executives by selling more than one million dollars in 1995. Indeed, Robin's 1995 annual review noted that his sales had met the minimum requirement of one million dollars. However, it seems evident from our review of the record that the one million dollar sales quota represented only the minimum required of senior account executives, and Espo's expectations of Robin were based on the relative perfor-

---

**3.** As a threshold matter, to preclude summary judgment, a plaintiff must establish that he was within the protected class for age (over 40) and a qualified individual under the ADA. The ADA prohibits discrimination by a covered entity only "against a qualified individu-

al with a disability." 42 U.S.C. § 12112; *see Nowak,* 142 F.3d at 1002. As stated above, because Defendant does not challenge that Robin failed to established these elements, we will not address them.

mances of other senior account executives and his status as an 11 year account executive veteran. With that in mind, Robin does not contest that he failed to clear one million dollars in sales in 1993, and despite satisfying the minimum requirement in 1995, he ranked last among fellow senior account executives in the areas of in-person customer calls, number of customers visited, percentage of client list covered, new customers and sales closed.

Further, Robin does not deny that he failed to meet Espo's expectation that his sales exceed 1.5 million dollars in 1996; rather, he argues that he was not given an opportunity to satisfy the expectation because he was fired at the end of the third quarter. By the end of third quarter, however, Robin's sales were on pace to fall far below 1.5 million dollars. Robin does not dispute that at the time of his discharge on September 27, 1996, he had sold only $572,943.00, more than one million dollars less than each of his fellow senior account executives and almost one million dollars below his assigned goal for the year. Nor does Robin challenge that he would have had to achieve more than $900,000.00 in sales in the remaining three months, almost double what he had sold to date. In all likelihood and according to projections, Robin was going to fall well short of his sales requirement; indeed, "an employer does not have to wait until its bottom line is affected to discipline an employee whose work is found wanting." *Leffel,* 113 F.3d at 794. Because a mere metaphysical possibility that he would have met the 1.5 million dollar expectation is not enough to create a material issue of fact, *see Hoffman,* 144 F.3d at 1121, we conclude that Robin failed to meet his employer's expectations.

▆▆▆ We now turn to whether 1.5 million dollars in sales was a *bona fide* expectation. Robin contends that Espo set him up for a fall with the $1.5 million sales quota because Robin had never reached that amount even in his best year and Espo knew that his clientele base, which was based in engineering firms, would not be able to accommodate such a lofty goal. Again, however, our role is not to second guess the business decisions of a company and inquire as to whether the goals set by management demand "too much" from its employees, *see Coco,* 128 F.3d at 1179, nor to "make things less difficult for those who come before us, regardless of the law." *See Fuja v. Benefit Trust Life Insur. Co.,* 18 F.3d 1405, 1407 n. 2 (7th Cir.1994). Here, Espo recognized that other senior account executives were rapidly increasing their sales "in a great market,"and set a sales expectation that was $100,000.00 more than Robin's 1989 sales of $1.4 million. Further, Robin's sales quota was well below the quotas set for other senior account executives: Hugh Dunbar, $3.2 million; and Tom Reicher, $2.0 million. Without singling out Robin, Defendant made an across the board demand of its senior account executives that they increase their sales.

▆▆▆ Plaintiff also points to the punitive tone of his performance goal as evidence that Espo's expectation was illegitimate. Although this difference in tone can be attributable to Robin's recent history of weaker sales performance relative to other senior account executives, again, we are in no position to measure, or much less evaluate, whether an employer speaks to its workers too harshly. Finally, Robin claims that the $1.5 million expectation is illegitimate considering his debilitating chemotherapy treatment and recovery. Certainly, such cancer treatment is enormously traumatic for any employee and, we would hope and expect, should engender leniency, compassion and help from a considerate and caring employer. Indeed, we are confident that many employers would have given Robin a reasonable amount of time to recoup his strength and a temporary alternative sales expectation to reflect his difficult physical and emotional predicament. Even Defendant's offer of a leave of absence to Robin, subject to Esposito Sr.'s sole determination of

whether he would be capable of returning, falls well short of applaudable employer compassion. However, despite Defendant's questionable treatment of Robin and our views toward ideal employer and employee relationships, we are "empowered to decide legal issues" alone, and not the "troubling social as well as ethical questions that go well beyond the legal issues" raised by Espo's conduct. *See Fuja*, 18 F.3d at 1412. We leave these "greater social questions" to be "decided by the political branches of government." *Id.* Accordingly, we are bound to acknowledge that Robin did not make a request for an accommodation under the ADA.[4] Although Robin might have qualified for an accommodation for his condition under the ADA, we regretfully recognize that without such a request, Espo was not required to accommodate his disability. *Cf. Beck v. University of Wisc. Bd. of Regents*, 75 F.3d 1130, 1134–36 (7th Cir.1996).

■■■ Accordingly, because Plaintiff does not contest the accuracy of his sales figures and the sales performances of other senior account executives, both of which form the basis of the $1.5 million sales expectation, we conclude that Robin has not presented sufficient evidence to establish that Espo's expectations were made in anything less than good faith. As such, we further conclude that Robin was not meeting his employer's bona fide expectations at the time of his discharge. For us to consider Robin's evidence of pretext, he has to establish a prima facie case of discrimination, which he has failed to do.[5]

4. Robin believed that Espo's proposed leave of absence was a veiled attempt to push him out, and consequently wrote in January 1996 that he was "fully qualified to continue in [his] duties ... as a capable and productive executive."

5. As evidence of pretext, Robin offers essentially the same evidence that he presented in support of his claim that the $1.5 million sales expectation was illegitimate: statements made by Esposito Sr. and Esposito Jr. about his age and illness; the 1993 and 1995 re-

## IV. CONCLUSION

We agree with the district court's granting of summary judgment in Defendant's favor. Judgment of the district court is AFFIRMED.

views; the leave of absence agreement; and assignment of a higher quota despite his debilitating disease. This evidence fails as either evidence of pretext or evidence that creates a convincing mosaic of discrimination because of the aforementioned reasons and significant evidence in the record of legitimate, performance related employment reasons for the discharge. Thus, even if we were to consider Robin's pretext arguments, we conclude that a rational jury could not reasonably find that Robin was discriminated against on the basis of his age or disability.