In re PAUL HARRIS STORES, INC., et al., Debtors in Possession.

Paul Harris Stores, Inc., et al., Plaintiffs,

v.

Expeditors International of Washington, Inc., Defendant.

Bankruptcy No. 00–12467–BHL–11.
Adversary No. 02–0479.

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

May 9, 2006.

Michael P. O'Neil, Jeffrey Graham, and Andrew Kight, Sommer Barnard Ackerson, PC, Indianapolis, IN, for Plaintiffs.

Thomas S. Hemmendinger, pro hac vice, Brennan, Recupero, Cascione, Scungio & McAllister, LLP, Providence, RI, Jeffrey L. Logston, James A. Knauer, Kroger Gardis & Regas, LLP, Indianapolis, IN, for Defendant.

## ORDER

BASIL H. LORCH III, Bankruptcy Judge.

This matter comes before the Court on Expeditors International of Washington, Inc.'s ["Expeditors"] Motion for Partial Summary Judgment on Expeditors' Counterclaim filed on August 29, 2005. The matter was fully briefed on November 11, 2005. Based upon the pleadings and evidence presented, the Court makes the following Findings of Fact:

1. On October 16, 2000 [the "Petition Date"], the Debtors filed voluntary Chapter 11 petitions for relief with this Court under Title 11 of the United States Code. [Complaint, ¶ 2.]

2. Prior to the Petition Date, Paul Harris Stores, Inc. ["Paul Harris"] operated a number of retail stores, selling women's clothing. [Deposition of Ronald W. Martin, p. 42.] Paul Harris continued to operate such stores for several months after the Petition Date, or until March 2001. [Martin Deposition, pp. 42, 62, 100.]

3. Expeditors is a non-vessel operating common carrier, customs broker, freight forwarder and freight consolidator. [Affidavit of A.J. Tangeman, ¶ 2.]

4. Before the Petition Date, Paul Harris ordered merchandise [collectively, the "Post–Petition Goods"] for its retail stores from United Peak Limited, Easyknit International Trading Company Limited, and Beckey Ltd. [collectively, the "Vendors"] for an aggregate purchase price of $138,754.25. [Tangeman Affidavit, ¶¶ 4, 5 and 6; Martin Deposition, pp. 99–102, 109 and Exhibits D–12, D–13 and D–14 thereto.]

5. The terms of sale between Paul Harris and the Vendors required Paul Harris to pay for the Post–Petition Goods by letters of credit before Paul Harris received physical possession of the Post–Petition Goods. [Tangeman Affidavit, ¶ 8.]

6. Paul Harris hired Expeditors to transport the Post–Petition Goods from Hong Kong to Indianapolis and to clear the Post–Petition Goods through United States Customs. [Tangeman Affidavit, ¶¶ 4–6.] Expeditors issued bills of lading for the Post–Petition Goods, naming LaSalle Bank as consignee, and transported the Post–Petition Goods from Hong Kong to Indiana. [Tangeman Affidavit, ¶ 9.]

7. Expeditors, upon clearance of the Post–Petition Goods through United States Customs, erroneously delivered physical possession of the Post–Petition Goods directly to Paul Harris, rather than to LaSalle Bank or its designee. [Tangeman Affidavit, ¶ 10.]

8. At the time Expeditors physically delivered the Post–Petition Goods to Paul Harris, the Vendors had not been paid the purchase price of the Post–Petition Goods. [Tangeman Affidavit, ¶ 11.]

9. Paul Harris sold substantially all of the Post–Petition Goods in the course of its operations and/or liquidation in Chapter 11. [Martin Deposition, pp. 109–111.]

10. The proceeds from the sale of the Post–Petition Goods were paid either to Paul Harris or to LaSalle Bank on account of its claims against Paul Harris. [Martin Deposition, pp. 110–111.]

11. Neither Paul Harris nor LaSalle Bank paid the Vendors any portion of the purchase price of the Post–Petition Goods. [Tangeman Affidavit, ¶ 12.]

12. The Vendors, not having received payment of the purchase price, alleged that Expeditors should not have delivered the Post–Petition Goods to Paul Harris. [Tangeman Affidavit, ¶ 13.] Therefore, the Vendors made demand on Expeditors for the full $138,754.25 purchase price. [Tangeman Affidavit, ¶ 13 and Exhibit E thereto.]

13. Expeditors settled the Vendors' claims against it for $97,500.00 and thereafter reduced its said damages to $52,637.50. [Tangeman Affidavit, ¶¶ 14, 15.]

14. Although Paul Harris received the Post–Petition Goods and utilized said goods for its own benefit, neither Paul Harris nor LaSalle Bank made any payments therefor. [Tangeman Affidavit, ¶ 16.]

15. On September 27, 2002, Paul Harris commenced this adversary proceeding under 11 U.S.C. § 547 in an effort to recover certain payments made to Expe-

ditors within ninety days prior to the Petition Date and alleged to be preferential transfers.

16. On December 2, 2002, Expeditors timely answered Paul Harris's Complaint and asserted a counterclaim for recovery of $52,637.50 for the Post–Petition Goods.

## Discussion

Expeditors seeks partial summary judgment on its counterclaim wherein it asserts that Paul Harris is liable for $52,637.50, the net amount that Expeditors paid to the Vendors for the Post–Petition Goods. Expeditors also asserts that its claim is entitled to an administrative expense priority pursuant to 11 U.S.C. § 503(b).

Summary judgment is appropriate when there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Upon a motion for summary judgment, the Court will view the evidence in the light most favorable to the non-moving party and will draw all reasonable inferences in favor of the non-moving party. *Markel v. Board of Regents of Wisconsin System,* 276 F.3d 906, 911 (7th Cir.2002). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir.2000).

Paul Harris argues that Expeditors has failed to establish that the Debtors did not pay the Vendors for the Post–Petition Goods. In its Answer to the Counterclaim, Paul Harris denies all of the substantive allegations of the Counterclaim, including even the existence of any post-petition transactions between Paul Harris and the aforesaid Vendors. Certainly, Paul Harris is in possession of its books and records and is in the best position to establish the truth or falsity of the allegations. Paul Harris points to the deposition testimony of its own representative, Mr. Ronald W. Martin, Vice President of the Debtors. When Martin was asked whether the Debtors paid the Vendors for the Post–Petition Goods, he replied that he did not know.

■ Based upon the Debtors' purported inability to establish payment, Expeditors then turns to another source for confirmation of payment or non-payment. In the Affidavit of A.J. Tangeman, Assistant General Counsel for Expeditors, he states that, at the time Expeditors delivered the Post–Petition Goods to the Debtors, the Vendors had not been paid for the goods and that neither the Debtors nor LaSalle Bank paid the Vendors any portion of the purchase price of the Post–Petition Goods thereafter. Based upon that alleged failure of payment, the Vendors made demand upon Expeditors, who was held liable for the nonpayment and subsequently settled the claim against it in full satisfaction of the debt. The Court finds that such testimony and evidence satisfies Expeditors' initial burden of proof. While the initial burden is on the movant to establish elements in support of its claim, having done so, the burden shifts to the nonmovant to provide either an excuse or reason for nonpayment or to establish that payment was, in fact, made. Paul Harris has made no effort to do so.

Expeditors cites the case of *Loving v. Ponderosa Systems, Inc.,* 479 N.E.2d 531, 536 (Ind.1985), as support for the invocation of the doctrine of equitable subroga-

tion. That court stated that equitable subrogation "is not founded upon contract but upon principles of equity and is applicable in every instance in which one party, not a mere volunteer, pays the debt of another which, in good conscience, should have been paid by the one primarily liable." *Id.* at 536 (citation omitted). That court went on to state:

> Subrogation has been characterized as an eminently just doctrine, a pure unmixed equity, one of the benevolences of the law, created, fostered, and enforced in the interest and for the promotion of equity and justice, and to prevent injustice. Being founded on principles of natural reason and justice, it is a highly favored doctrine, which is to be given a liberal application, and which the courts are inclined to extend rather than to restrict. Perhaps no doctrine of equity jurisprudence is more beneficent in its operation, and perhaps none stands in higher favor.

*Id.* (citation omitted.)

■ The Court is, likewise, unimpressed with Plaintiff's argument that Expeditors failed to discharge the *entire* debt held by the original obligor. Although Expeditors did, in fact, settle the Vendors' claim for less than the entire debt, there is no reasonable probability of double exposure on the Debtors in this forum. Finally, although Expeditors wrongfully delivered the Post–Petition Goods to Paul Harris, which action precipitated the former's liability to the Vendors, such action does not rise to the level of culpable negligence so as to preclude equitable subrogation. Because Paul Harris has not satisfactorily refuted the allegations of nonpayment set forth in Tangeman's Affidavit, the Court finds in favor of Expeditors and grants summary judgment on its Counterclaim.

■ The last matter the Court must take up is the issue of administrative priority. The Court would agree, based upon the evidence, that Expeditors' payment to the Vendors represents an acquisition cost. The Bankruptcy Code grants administrative priority to "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. §§ 503(b) and 507(a)(1). In order for Expeditors' claim to be considered an administrative expense, it must show that the debt (1) arose from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business. *See, In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984).

Paul Harris asserts that Expeditors' payment to the Vendors conferred no benefit on the bankruptcy estate. Because Expeditors had the misfortune of erroneously delivering the Post–Petition Goods directly to Paul Harris, the later contends that Expeditors' subsequent payment for the said Goods was of no matter to Paul Harris. Yet such an argument ignores the debtors' continuing liability for the purchase price for goods received. Certainly, the Vendors had the right to make a claim against Paul Harris for the purchase price. Instead, they opted to pursue the solvent company who enabled an insolvent company to take possession of unpaid merchandise in contravention of their agreement. Such a turn of events took the proverbial monkey off the back of Paul Harris and the Vendors have not, therefore, pursued a claim against the estate. So to contend that there was no benefit to the estate is simply disingenuous. Paul Harris gained possession of Post–Petition Goods which it never paid for, yet sold them, presumably, for an amount well in excess of the contract purchase price. Those proceeds clearly benefitted the estate.

Equity dictates that Expeditors is entitled to an administrative expense claim in the amount of $52,637.50. Judgment is entered in favor of the Defendant in accordance herewith.