Paul P. LINDSEY, Plaintiff,

v.

RADIOSHACK CORPORATION, an
Illinois registered corporation
Defendant.

No. 05 C 638.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 22, 2006.

James S. Whitehead, Michael B. Segall, Sidley Austin LLP, Chicago, IL, Counsel for Plaintiff.

John P. DeRose, Jessica R. Hill, John P. DeRose & Associates, Hinsdale, IL, Counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

MORTON DENLOW, United States Magistrate Judge.

After a 22–year career with RadioShack Corporation ("RadioShack"), Plaintiff Paul Lindsey ("Plaintiff") was terminated. He claims that he was fired because of his age, 62, and has filed a two-count age discrimination complaint. RadioShack argues that the termination was based on Plaintiff's poor job performance, and has filed the motion for summary judgment that is now before the Court. For the reasons stated herein, the Court concludes that Plaintiff has produced sufficient evidence to survive summary judgment on Count I of Plaintiff's complaint. Plaintiff voluntarily dismisses Count II with prejudice.

## I. BACKGROUND FACTS

The following facts are undisputed or presented in the light most favorable to Plaintiff when contested.

## A. THE START OF PLAINTIFF'S CAREER AT RADIOSHACK

Plaintiff was born on July 19, 1941. PR ¶ 5.[1] He was first employed by RadioShack as a manager trainee on November 26, 1982, at age 41, and was promoted to Store Manager a year later. PR ¶ 6. Plaintiff had an up and down career at RadioShack. In 1988, he was promoted to the position of Senior Store Manager, a title unrelated to

---

1. Citations to the record are in the following form: Defendant's 56.1(a) Statement of Material Facts are cited as DSOF ¶ __; Plaintiff's 56.1(a) Statement of Additional Facts are cited as PSOAF ¶ __; Plaintiff's Response to Defendant's 56.1(a) Statement of Material Facts is cited as PR ¶ __; Defendant's Reply to Plaintiff's Response to Defendant's 56.1(a) Statement of Material Facts is cited as DY ¶ __; Defendant's Response to Plaintiff's 56.1(b) Statement of Additional Facts is cited as DR ¶ __; Plaintiff's Memorandum of Law in Opposition to Summary Judgment is cited as Pl. Mem. at __; Plaintiff's Complaint is cited as Compl. at ¶ __; Plaintiff's Appendix in Support of Her Opposition to Summary Judgment is cited as Pl.App. Ex. __; the Appendix to Defendant's Motion for Summary Judgment is cited as Def.App. Ex. __.

his age. PR ¶ 7. In 1993, Plaintiff was demoted to Sales Associate, but was promoted back to Senior Store Manager later the same year. PR ¶ ¶ 12–13; DR ¶ 12. Plaintiff received a number of awards during his tenure at RadioShack, including "Manager of the Month" more than 30 times and various sales and performance awards. Pl.App. Ex. 5. He was also reprimanded for his store's appearance, his failure to train his Sales Associates, and various other issues. PR ¶ 14–19.

The duties of a Store Manager and Senior Store Manager at RadioShack include the various aspects of managing a retail store, such as opening and closing the store, making bank deposits, controlling payroll, scheduling, ordering merchandise, selling, controlling inventory, training Sales Associates, and maintaining the appearance of the store. PR ¶ 8. Store Managers are supervised by District Managers ("DM"), who are in turn supervised by Regional Managers ("RM"). PR ¶ 9.

## B. POTTER BECOMES PLAINTIFF'S SUPERVISOR

In December 2002, Stephanie Potter ("Potter") became Plaintiff's DM. PR ¶ 26. Potter saw problems with Plaintiff's job performance almost immediately, noting that Plaintiff's store experienced a loss of sales in January and April 2003. PR ¶ ¶ 27–28. Potter therefore assigned Plaintiff a list of tasks in April 2003 related to recruiting and training Sales Associates and task organization. PR ¶ 28. These tasks were required of all Store Managers. PR ¶ 29.

## C. TRANSFER TO THE WHEATON STORE IN APRIL 2003

Most of the issues in this case trace back, at least indirectly, to Plaintiff's transfer in April 2003 to the Wheaton, Illinois RadioShack location. PR ¶ 30.

Potter asked Plaintiff if he would like to transfer to Wheaton after he told her that the distance from his home to his then-current store location was a problem. *Id.;* Def.App. Ex. 3 at 120–21. Unfortunately, from the date of the transfer in April 2003 through November 2003, the street on which the Wheaton store was located was shut down for construction. DR ¶ ¶ 1–2. Sales at the Wheaton store and at other businesses in the area suffered, which Plaintiff attributes to the loss of traffic. DR ¶ 3; Pl.App. Ex. 2.

The parties dispute whether Potter was aware of the construction at the time she transferred Plaintiff. DR ¶ 4. In any event, Potter certainly knew of the construction within a few days of the transfer. DR ¶ 4.

## D. POTTER'S DOCUMENTATION OF PROBLEMS AFTER THE TRANSFER

During the next few months, Potter began to document various shortcomings in Plaintiff's job performance and she assigned him tasks intended to improve his performance. In June 2003, Potter told Plaintiff that he needed to write to-do lists and check his webmail twice a day, and discussed with Plaintiff his difficulties in completing tasks. PR ¶ 31. In August 2003, a District Manager–In–Training told Plaintiff that he needed to improve wireless performance and engage in various training activities with the store's Sales Associates. PR ¶ 32. In November 2003, Plaintiff's store failed to sell any cellular phones. PR ¶ 33. Potter learned during a visit that the phones were not properly priced or displayed. *Id.* Potter noted that Plaintiff was "doing the wrong things right and spending way too much time on [those] tasks," and had missed a required conference call. *Id.*

In December 2003, the average sales ticket amount at the store, or "average per ticket" ("APT"), was less than $23, as compared to the district average of over $32. PR ¶ 34. Potter provided Plaintiff with specific sales improvement goals and noted that Plaintiff needed to improve the training of his Sales Associates. *Id.* Later in December 2003, Plaintiff had not completed several tasks, such as providing goals for Sales Associates, completing the monthly sales plan for January 2004, conducting a store meeting, and updating "Answer Center" materials. PR ¶ 35.

### E. REGIONAL MANAGER'S STORE VISIT AND MEMO

Christopher Frank ("Frank")-Plaintiff's RM and Potter's supervisor-visited Plaintiff's store in February 2004 with Potter. PR ¶ 36. This was Frank's one and only visit. Immediately upon his arrival, Frank told Plaintiff that he "could get any kid off the street with no training to do a better job than [Plaintiff]." DR ¶ 7. Frank then told Plaintiff that the Wheaton store had thirteen months of sales losses. DR ¶ 8. Plaintiff informed Frank that he had not been at the store for a year yet and about the road construction, which Potter confirmed. DR ¶ 9–10.

Frank next asked Plaintiff if he planned on retiring soon. DR ¶ 11. Plaintiff replied that he planned to work until 70 if he was able. *Id.* Finally, Frank told Plaintiff that it would be sufficient if Plaintiff raised the store's APT to $25 within 90 days (by May 2004), which Plaintiff agreed to do. PR ¶ 37.

Frank sent a memo to Potter later in February 2004[2] stating:

> Paul [plaintiff] needs to be replaced. He lacks the Desire, Energy, Enthusiasm, and Passion to win. . . . I invested some time teaching his full-timer basic selling skills and he seemed to accept the direction. Paul agreed that $25 [APT] in 90 days should be the minimum expectation in order to maintain his employment. He said that target was "fair" and "easy." He said that he wants to retire in a few years.
>
> . . .
>
> Work through the associates. Paul admitted that he does not have selling skills. Until you can train his replacement, provide training and motivation to the associates directly.

Pl.App. Ex. 7.

▮ Plaintiff offers further evidence of Potter's and Frank's age animus. Plaintiff alleges that he was told by another employee, Dan Nicholson, that Frank said to Potter, "[w]ith two blacks and two old farts in this store, we're not going to have any problems with the EEOC," to which Potter replied with laughter. Pl.App. Ex. 1 at 36–37. The comment was not directed at Plaintiff or his store, *id.,* and the record does not indicate when or where the comment was made.[3] In addition, Plaintiff has not submitted an affidavit from Nicholson, so Plaintiff's deposition testimony that Nicholson told him about the statement, which Nicholson himself overheard, is the only evidence of the statement. This is

---

**2.** Plaintiff alleges that the memo was sent in January, but RadioShack contends that the memo was written in February, after Potter and Frank visited Plaintiff's store. DR ¶ 5. The memo is dated January 12–14, 2004, but also refers to Frank's conversation with Plaintiff during the February visit. Pl.Ex. 7. Therefore, the memo is taken to have been written

in February, after the store visit by Frank and Potter.

**3.** PSOAF ¶ 39 dates the statement to February 2004 and cites as support Plaintiff's deposition at 36–37, but no date is actually provided in Plaintiff's deposition. *See* Pl.App. Exh. 1 at 36–37.

obviously hearsay, and the Court gives the statement no weight. *See* Fed.R.Evid. 802; *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir.1992) ("When acting on a motion for summary judgment the judge considers only evidence that would be admissible at trial.").

## F. FIX 1500 PROGRAM AND PLAINTIFF'S TERMINATION

In the month following the February visit, Potter congratulated Plaintiff on his February sales gain, but continued to document problems. PR ¶ 38; Def.App. Ex. 30. Potter gave Plaintiff poor grades in all areas during her March 2004 store visit. *Id.* While Plaintiff disagreed with the accuracy of some of the grades during his deposition, Plaintiff does not dispute that at least some of the poor grades were justified. PR ¶ 38. Plaintiff's APT at the time of the visit was $22.21, below the $25 minimum set by Frank. PR ¶ 39. Potter outlined several tasks for Plaintiff to complete, including updating the Answer Center and conducting certain training activities with Sales Associates. *Id.* These tasks were expected of all Store Managers. *Id.*

In the spring of 2004, RadioShack implemented its "FIX 1500" program, designed to identify the weakest performing managers and develop an accelerated plan to improve their skills. PR ¶ 40. Under the plan, all of RadioShack's store managers were graded and ranked, using the following criteria: inventory management, merchandising and store display, organization and paperwork, recruiting/hiring/developing, performance management, people and activity scheduling, training/product knowledge and information retrieval, customer care, directing sales, and values/motivation. *Id.*; Def.App. Ex. 1.A. Plaintiff ranked 19 of 23 in the district and was placed in the FIX 1500 program. PR ¶ 41–42. At the time Potter informed Plaintiff about his placement in the program, she also said, "Maybe you should look for a job at Home Depot because I think they're hiring older people." PR ¶ 43; Def.App. Ex. 3 at 27. Plaintiff replied, "Not a chance." Def.App. Ex. 3 at 27.

Plaintiff was assigned a variety of tasks as part of the FIX 1500 program, including training tasks related to Sales Associates, signing up new applicants, reading webmail, and using to-do lists. PR ¶ 42; DR ¶ 15. Plaintiff was also required to document all of the tasks he performed. PR ¶ 42. RadioShack set a deadline of August 30, 2004, by which Plaintiff was to improve his performance to the required level. Pl. App. Ex. 9. Plaintiff informed Potter that he would have a very hard time completing and documenting the tasks in light of the amount of help he had at the store and Potter's requirement that Plaintiff cut back the number of hours he worked. DR ¶ 16–17.

Potter made two visits to Plaintiff's store during June 2004, and noted several performance deficiencies. PR ¶ 48. Plaintiff failed to lead the store in wireless hit rate ("WHR"), update the training area, ensure that a particular Sales Associate passed a test, write a daily to-do list on some days, sign up two new applicants per week, and document some of the tasks he performed PR ¶ 48.[4]

---

**4.** Plaintiff contests RadioShack's assertion that, in addition to Plaintiff's failure to document all of the tasks, Plaintiff admitted that he failed to complete all of the tasks assigned to him. PR ¶ 49. Plaintiff relies on a statement he made early in his deposition that he completed the tasks. *Id.* Later in the deposition, in response to more specific questions, however, Plaintiff admitted that he failed to complete several of the tasks, such as leading the store in wireless phone sales, updating the training center, training, signing up new ap-

While RadioShack points to the various tasks Plaintiff failed to perform or document as the reasons for Plaintiff's discharge, RadioShack does not dispute that Potter told Plaintiff that her "desired state" for Plaintiff as a result of the FIX 1500 program was a "motivated manager with profitable sales growth and $25 [APT] and 50[WHR]." DR ¶ 18. In May 2004, the sales gain for the store was 41.7%, higher than all but one other store in the district. DR ¶ 33. In June 2004 the store's APT rose to $24.61 and the store registered a sales gain of 25.5%. DR ¶ 23. Further, RadioShack's sales reports indicate that the store's WHR for June 2004 was 53, down from 66 in May and 79 in April. Pl.App. Ex. 6.

Despite Plaintiff's continued progress toward the sales, APT, and WHR goals, on June 26, 2004, more than two months before Plaintiff's program completion deadline date, Potter appeared at Plaintiff's store and ordered him to turn over his keys because she was terminating him. DR ¶ 19. Plaintiff asked Potter what had happened, but was simply told to get his stuff and leave. DR ¶ 20. Plaintiff was replaced by Robert Kent, who was in his early 40s at the time. PR ¶ 54. Plaintiff was 62 years old at the time of the termination. *See* PR ¶ 5, 50.

## G. RADIOSHACK'S TREATMENT OF OTHER MANAGERS

Plaintiff points to several allegedly younger, similarly situated managers placed in the FIX 1500 program but re-

tained by RadioShack. One set of managers was derived from a document entitled "List of Store Managers in RadioShack District 01–0363": John Fry, age 57, who remained active; Kevin Slad, age 23, who was discharged; Brian Stuart, age 47, who remained active; and Yolanda Wells, age 42, who resigned. DY ¶ 47; Pl.App. Ex. 4. Plaintiff does not have any evidence related to the performance of these managers in the program, and the date of the document is not provided.

Plaintiff also relies on data found in two FIX 1500 summary reports prepared by RadioShack, and identifies a number of managers who were listed as having performance problems but were either retained as managers or demoted.[5] DR ¶ 37; Pl.App. Ex. 9 and 10. These reports do not reveal the ages of the managers and list their performance deficiencies only in very broad terms (e.g., "doesn't get it" or "wants to improve but not moving fast enough"). Pl.App. Ex. 9 and 10. Plaintiff has not submitted store visit reports or any other information about these managers or their ages.

Plaintiff also points to Jose Montilla as evidence of a similarly situated younger employee who was inadequately performing but not placed in the FIX 1500 program. RadioShack does not dispute that Montilla was 41 at the time Plaintiff was placed in the program, suffered a 10.8% monthly sales loss, and had an APT of $23.58. DR ¶ 36. It is also clear that Montilla's WHR was 23 and that Montilla scored higher in the ratings used by Ra-

---

plicants, and writing a to-do list every day. Def.App. Ex. 3 at 189–91. Thus, even taking this evidence in the light most favorable to Plaintiff, the Court will treat as undisputed that Plaintiff failed to perform some of the tasks assigned to him as part of the FIX 1500 program.

**5.** The two sets of managers, one from the "List of Store Managers" document and one from the FIX 1500 summaries, appear inconsistent. It is possible that they simply reflect different points in time. In any event, the Court will consider all of these managers as potential similarly situated younger employees to the extent the evidence supports such a conclusion.

dioShack to identify the managers destined for the FIX 1500 program. Pl.App. Ex. 6; Def.App. Ex. 1.A.

## H. THE LITIGATION

Plaintiff filed a two count complaint seeking compensatory damages in excess of $500,000 and reasonable attorney's fees and costs. Compl. at ¶¶ 52–71. Count I is titled "Violation of the Age Discrimination in Employment Act," and sets forth the elements of an indirect method claim of age discrimination based on Plaintiff's termination. *Id.* at ¶¶ 52–59. Count II is titled "Violation of the Age Discrimination in Employment Act Disparate Impact," and essentially sets forth disparate impact claims based on both the implementation of the FIX 1500 program and the terminations that resulted therefrom. *Id.* at ¶¶ 60–71. RadioShack has filed a motion for summary judgment on both counts. At oral argument on September 13, 2006, Plaintiff agreed to voluntarily dismiss Count II. Therefore, the Court will consider RadioShack's motion with respect to Count I only.

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the burden of establishing that there exists no genuine issue of

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). However, the party bearing the burden of proof on an issue at trial may not rest on the pleadings, but must "designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The evidence is viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### B. AGE DISCRIMINATION IN EMPLOYMENT ACT

The Age Discrimination in Employment Act ("ADEA") prohibits an employer from discharging an employee on the basis of her age. 29 U.S.C. § 623(a)(1). To succeed under a disparate treatment theory, an ADEA plaintiff must show that "the employee's protected trait actually played a role in [the decision-making] process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). The plaintiff may do so using either a direct or indirect method. *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1060 (7th Cir.2003). Plaintiff proceeds only under the indirect method.

Under the indirect method adapted from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a burden-shifting approach is used. *See Raymond v. Ameritech Corp.,* 442 F.3d 600, 610 (7th Cir.2006). First, the plaintiff must establish the following elements of the *prima facie* case: (1) that he was a member of the protected age group; (2) that he was satisfying the employer's legitimate expectations; (3) that he was discharged or demoted; and (4) that the

employer sought a younger replacement. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Olson v. Northern FS, Inc.*, 387 F.3d 632, 635–36 (7th Cir.2004) ("In an attempt to better reach the ultimate question of when, as here, an employee within the protected class has been discharged and replaced, we have required that the employee show only that 'he was performing his job to his employer's legitimate expectations' and that the employer 'hired someone else who was substantially younger . . . .'") (*quoting Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089–90 (7th Cir.2000)); *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir.1999) (explaining that "sought a younger replacement" is the appropriate fourth element "[i]n situations involving the simple termination of a single employee," and that "treated less favorably than one or more similarly situated younger employees" alternative applies to reduction-in-force cases).[6]

 Second, if the *prima facie* case is satisfied, the employer must come forward with a legitimate and non-discriminatory reason for the employment action taken. *Raymond*, 442 F.3d at 610. Finally, if the employer provides such a reason, the plaintiff must show that there is a question of fact as to whether the proffered reason was a pretext. *Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir.2004). The Seventh Circuit has defined pretext as meaning that the employer's explanation is factually baseless, was not the real motivation for the decision, or was insufficient to motivate the decision. *Id.*

 Generally, a court may not require the employer to proffer reasons for the discharge or conduct a pretext analysis unless the plaintiff has first satisfied the *prima facie* case. *Cerutti*, 349 F.3d at 1061, 1064. Oftentimes, however, the failure to meet the employer's expectations, the second element of the *prima facie* case, is the proffered reason for the adverse employment action taken against the employee. Therefore, the Seventh Circuit has, in some circumstances, allowed plaintiffs to move beyond the *prima facie* case without fully satisfying it. One such circumstance is where the plaintiff alleges that the expectations themselves are pretextual. *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404–06 (7th Cir.1996).

## III. PLAINTIFF HAS RAISED A MATERIAL ISSUE OF FACT ON COUNT I

 The parties do not dispute that the first, third, or fourth elements of the *prima facie* case are satisfied. The fate of this summary judgment motion turns, therefore, on whether a reasonable jury could find RadioShack's proffered reason for Plaintiff's termination-that he failed to satisfy RadioShack's legitimate expectations-is a pretext, and that age in fact was a determinative factor in Plaintiff's termination

Plaintiff's pretext theory begins with Frank's decision in February 2004 to terminate Plaintiff. Frank's statements during the store visit and in the memo to Potter could lead a jury to conclude that: (1) Frank decided that Plaintiff would be terminated once a replacement was trained; (2) Frank set the $25 APT target anticipating that Plaintiff would be unable to meet it in order to use the target as an eventual justification for Plaintiff's termi-

6. *But see Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 326 (7th Cir.2002) (using "similarly situated younger employees treated more fa- vorably" in termination and replacement case).

nation; and (3) Plaintiff's age was a determining factor in Frank's decision.

Plaintiff's pretext theory is further supported by RadioShack's treatment of Plaintiff under the FIX 1500 program and the circumstances of Plaintiff's termination. Potter's suggestion that Plaintiff apply for a job at Home Depot because it was hiring older people, made at the same time she told him about his placement in the FIX 1500 program, supports Plaintiff's theory. Further, RadioShack asserts that its expectations under the FIX 1500 program were that Plaintiff would complete all of the various tasks assigned to him, such as using the to-do list every day and documenting all of his tasks. A reasonable jury could certainly conclude, however, that Potter was truthful when she told Plaintiff that her desired state for Plaintiff under the program was "a motivated manager with profitable sales growth and $25 [APT] and 50 [ ("WHR") ]." Thus, Plaintiff has produced sufficient evidence that RadioShack was not actually motivated by its asserted reasons for the termination, making them mere pretext.

A jury could also find the timing of Plaintiff's termination quite suspicious. Plaintiff's sales gains, APT, and WHR were all steadily improving, and were within striking distance of the targets set by Potter and Frank, yet RadioShack terminated Plaintiff more than two months before the stated completion date under the FIX 1500 program. It is but a small step to the conclusion that Potter and Frank were determined to fire Plaintiff and decided to do so before he satisfied their stated expectations.

Finally, Plaintiff's pretext theory is supported by RadioShack's demotion of other managers who did not satisfy the requirements of the FIX 1500 program. While information about these other managers such as their ages and exact deficiencies under the Program is not yet fully developed and will be left as an issue for trial,[7] the fact that RadioShack had demotion available as an option, and had in fact previously demoted Plaintiff when he was considerably younger, gives rise to an inference that age was a determining factor in terminating rather than demoting Plaintiff.

## IV. CONCLUSION

It is undisputed that Plaintiff was a member of the ADEA protected class who was terminated and replaced with a younger employee. Plaintiff has come forth with sufficient evidence to require a jury to decide whether RadioShack's proffered reasons for his termination-that he failed to satisfy RadioShack's expectations under the FIX 1500 program-are a pretext. A reasonable jury could conclude that age was a determining factor in RadioShack's decision to terminate Plaintiff.

A reasonable jury could also conclude that RadioShack's proffered reasons are true, and that age was not a determining factor in RadioShack's decision to terminate Plaintiff. The final determination must await the trial for which our legal system so wisely provides.

For these reasons, Defendant's motion for summary judgment is denied as to Count I and granted as to Count II of Plaintiff's complaint. The case is set for

---

**7.** It should be noted again that because this is a termination and replacement case, the Court is not requiring Plaintiff to show that similarly situated, younger employees were treated more favorably by RadioShack. Thus, the fact that Plaintiff has not yet developed the facts of the ages or employment deficiencies of these other managers does not mean that RadioShack is entitled to summary judgment.

status and to set for trial on October 5, 2006, at 10:00 A.M.